THE BOARD OF EDUCATION OF THE STATE OF ILLINOIS

*v.*

GREENEBAUM & SONS.

| 39 | 609 |
| 122 | 342 |
| 122 | 344 |
| 122 | 350 |
| 39 | 609 |
| 159 | 174 |
| 161 | 365 |
| 39 | 609 |
| 71a | 165 |
| 39 | 609 |
| d182 | 157 |
| 182 | 160 |

1. PLEADING—*allegation of authority of an agent.* In a petition against the board of education of this State, to enforce a mechanic's lien, it was alleged that the contract was executed on the part of the board by certain persons named, who were the building committee of the board and who had full authority to make the contract. This was a sufficient allegation that the persons who signed the contract were authorized to do so.

2. AGENT—*power of a corporation to appoint.* The board of education may act by an agent. The old doctrine that corporations can only be bound by acts under their corporate seal, has been long exploded.

39—39TH ILL.

3. CORPORATE SEAL—*whether essential.* Nor is it essential that the appointment of an agent by a corporation should be under the corporate seal. The acts of a corporation evidenced by vote, written or unwritten, are as completely binding upon it, and are as complete authority to its agents, as the most solemn acts done under the corporate seal; it may as well be bound by express promises through its authorized agents as by deed; and promises may as well be implied from its acts and the acts of its agents, as if it were an individual.

4. CORPORATE NAME—*of the degree of accuracy required in its use.* The transposition, interpolation, omission or alteration of some of the words going to make up the name of a corporation, is not material, if it makes no essential difference in their sense.

5. So where it was alleged that a contract was entered into by one of the parties by the name and style of "The State Board of Education of Illinois," when by the act creating the corporation, the name given to it was, "The Board of Education of the State of Illinois," it was held, that, although the words were transposed in the contract, the name and style remained substantially the same.

6. PLEADING—*averment as to the name in which a contract was made.* When a contract is made by a corporation by a name varying from the true name, it may be sued in its true name, the plaintiff averring in his declaration that the defendant made the contract by the name mentioned therein. This is the usual and formal mode of declaring on such contracts.

7. PRACTICE—*objections to evidence, at what time they must be taken.* Objections to the admission of evidence, to be availing, must be taken on the trial below; they cannot be made for the first time on error.

8. EXCEPTIONS—*when necessary.* The rulings of the court below upon questions of evidence, cannot be assigned as error, unless exceptions thereto are taken on the trial. ·

9. NORMAL UNIVERSITY—BOARD OF EDUCATION—*whether the property thereof is subject to creditors, or whether the university is a State institution.* The property of the Normal University is not the property of the State, but is the property of the "Board of Education of the State of Illinois," as a corporation, whose charter cannot be repealed by the legislature. The corporation may sue and be sued, and, unlike a municipal corporation, the only remedy a creditor has against it, is by a judgment and execution, as in a case against an individual or other corporation not of a municipal character.

10. SAME—*subject to mechanic's lien.* So it is held that the Normal University building is subject to the claims of a creditor under the law providing for the enforcement of a mechanics's lien.

WRIT OF ERROR to the Circuit Court of McLean county.

This was a proceeding instituted by Greenebaum & Sons in the court below, to the September Term, 1861, against the Board of Education of the State of Illinois, to enforce a mechanic's lien.

It is stated in the petition that on the third day of March, 1860, the plaintiffs entered into a written contract with the defendants, by the name and style of "The State Board of Education of Illinois," and "that the said contract was executed on the part of said board of education by C. B. Denio, J. S. Post, C. E. Hovey and S. W. Moulton, the building committee of said board, who had full power to make said contract."

It is further alleged that the said board of education was the equitable owner of certain lands and buildings, and that the plaintiffs, under said contract, were to do the plastering and plumber's work on the Normal University building by the 1st day of July, 1860. That by the terms of the contract the plaintiffs were to be paid for plastering, $28\frac{6}{10}$ cents per yard, and for plumber's work, $2,800, all of which was to be paid on the 1st of March, 1861.

The plaintiffs allege that they performed the work according to contract, and have not been paid, and they pray for a mechanic's lien, and that the property be sold, etc.

At the December Term, 1861, the defendant filed a demurrer to the petition, alleging in support thereof,

1. That it does not appear by said petition that the persons who signed the contract were authorized by the said board of education to sign the same.

2. That it does not appear from the petition that the persons who signed the contract were the agents of the said board of education and authorized under the seal of said board to act for them.

3. That the said board of education cannot act by an agent.

The court overruled the demurrer and the defendants answered, denying all the allegations in the petition. The cause was heard by the court, and a decree was rendered in favor of the petitioners, finding the facts substantially as alleged in the petition. The court decreed that the board of educa-

tion was indebted to the petitioners in the sum of $8,293.10; that they have a mechanic's lien on the property, and that in default of payment by a day named, the property be sold, etc. Thereupon the defendants sued out this writ of error. The questions arising in the case are fully presented in the opinion of the court.

Mr. PERKINS BASS, for the plaintiffs in error.

Mr. W. C. GOUDY, for the defendants in error.

Mr. JUSTICE BREESE delivered the opinion of the Court:

Several objections are taken to the decree in this case, which we will notice in the order in which they are presented ; and,

1. Overruling the demurrer to the petition. The plaintiffs in error urge in support of the demurrer, that it does not appear by the petition that the persons who signed the contract were authorized to sign it. This objection is answerd by reference to the petition, in which it is alleged that " the contract was executed, on the part of the said board of education, by C. B. Denio, J. S. Post, C. E. Hovey and S. W. Moulton, the building committee of said board, who had full power to make said contract."

2. It does not appear by the petition that the persons who signed the contract were the agents of the board, and authorized under the seal of the board of education to act for it, and that the board cannot appoint or act by an agent. In other words, the board has no power to appoint an agent, and if it has, such appointment must be under the seal of the board.

As was remarked by this court in the case of the *Chicago, Burlington and Quincy R. R. Co. et al.* v. *Coleman et al.*, 18 Ill. 299, the old doctrine that corporations can only be bound by acts under their corporate seal has been long exploded, and as said by the Supreme Court of the United States in the case of *The Bank of the United States* v. *Dandridge*, 12 Wheaton, 68, cannot now, as a general proposition, be supported. In general, throughout the United States, it is entirely exploded, and it is

well settled that the acts of a corporation evidenced by vote, written or unwritten, are as completely binding upon it, and are as complete authority to its agents, as the most solemn acts done under the corporate seal; that it may as well be bound by express promises through its authorized agents as by deed; and that promises might as well be implied from its acts and the acts of its agents, as if it had been an individual. Angel and Ames on Corporations, 212, and the cases referred to in note.

3. The answer, it is said, denies the allegations of the petition, and the proofs preserved in the record are insufficient to sustain them, or the decree.

The allegations of the petition are clear and distinct as to the contract, and as to the facts on which a decree is sought. The evidence is found in the certificate of the judge who tried the cause, and proves, substantially, all the material facts alleged. The appointment of the plaintiffs in error, as a building committee, was proved by the production of the proceedings of the board, and their authority to make the contract, fully established. The records of the board were also introduced, wherein it was stated that the building was substantially completed, and claimed to be " the very best building of the kind in America, and perhaps in the world," and that the execution of the work, in accordance with the plans of the architect, has been most faithfully performed and in the very best and most workmanlike manner. Though it may not be stated in so many words, that the matters and things stated in the decree as found by the court were proved as facts on the trial, yet it is stated in the clearest terms in the decree, that the court found the facts stated in it. The decree is very formal, and contains the various findings of the court, and which fully establish the complainants' case, and in no essential particular variant from the evidence preserved in the certificate of the judge.

4. The next objection is that the contract is alleged in the petition to have been entered into by the plaintiffs in error by the name and style of " The State Board of Education of Illinois," whereas, by the act incorporating this board, the name

given to it is "The Board of Education of the State of Illinois," and provides that, "by that name and style shall have power to contract and be contracted with."

The proper name of this corporation is "The Board of Education of the State of Illinois." Scates' Comp. 425. In the contract words are transposed, but the name and style remain substantially the same. The same words are embraced in both names. It is a settled principle that the transposition, interpolation, omission or alteration of some of the words going to make up the name of a corporation, is not material, if it makes no essential difference in their sense. Angel & Ames on Corp. 77. In New Hampshire it was held, when a promissory note was given to the president, directors and company of, instead of to the Newport Mechanics' Manufacturing Company, which was the true name of the corporation to which the note was designed to be given, that the variance was not such as to preclude a recovery in the name of the corporation. *Newport Mec. Manf. Co.* v. *Starbird,* 10 N. H. 123; 1 Kyd on Corp. 237; Bac. Abr. title Corporation, C. 2. So this court held in *Chadsey* v. *McCreery,* 27 Ill. 253, that the transposition, alteration or omission of some words in the name of a corporation consisting of several words, was immaterial, if it was evident what corporation was intended.

The suit is brought against the corporation by its true name, with an averment that the contract was executed by the name used in it. This is the usual and formal mode of declaring on such contracts. It is a familiar principle, when a deed is made to a corporation, by a name varying from the true name, the plaintiffs may sue in their true name, and aver in the declaration that the defendants made the deed to them, by the name mentioned in the deed. *African Society* v. *Varick,* 13 Johns. 38. The contract in this case purports to have been entered into by the corporation by its agents, and their authority is abundantly shown by the acceptance of the work done under it, and pronounced by the plaintiffs in error as "the best building of the kind in America, and perhaps in the world."

As to the objection in regard to certain evidence introduced by the complainant, it is sufficient to say no objection was made to it at the hearing, and it is now too late to make one here for the first time. No exceptions appear to have been taken to any of the rulings of the court on the evidence, and therefore they cannot now be assigned as error. *Gibbons* v. *Johnson*, 3 Scam. 63; *Pottle* v. *McWorter*, 13 Ill. 455; *Gillespie* v. *Smith et al.*, 29 Ill. 478, referring to *Conway* v. *Case*, 22 id. 139; and *Sergeant* v. *Kellogg*, 3 Gilm. 281; *Swift et al.* v. *Whitney et al.*, 20 Ill. 144, and *Buntain* v. *Bailey*, 27 id. 410.

The objections might have been removed had they been specifically alleged. Not having been alleged, they must be considered as waived.

The principal objection to the recovery in this case, and the one most pressed, is, that the board of education is a corporation founded by the State, and supported by the funds of the State, and that its property is the property of the State, and therefore not subject to a mechanic's lien.

To determine the force of this objection, the act of 1857 must be considered, and the additional act of 1861.

The title of the first act is "An act for the establishment and maintenance of a Normal University." Its objects are declared to be to qualify teachers for the common schools of the State, by imparting instruction in the art of teaching in all branches of study which pertain to a common school education, in the elements of the natural sciences, including agriculture, chemistry, animal and vegetable physiology, in the fundamental laws of the United States and of this State, in regard to the rights and duties of citizens, and such other studies as the board of education may from time to time prescribe.

The persons named in the first section of the act, and the superintendent of public instruction, *ex officio*, with their associates, who should be elected as the act provided, and their successors, were created a body corporate and politic, to be styled "The Board of Education of the State of Illinois," and by that name had perpetual succession, power to contract, etc., to

sue and be sued, to acquire, hold and convey real and personal property.   The superintendent of public instruction was made secretary of the board, and required to report to the legislature at its regular sessions, the condition and expenditures of the university, etc.   No compensation was allowed to any member of the board except for traveling expenses.   The board was required at its first meeting on the first Thursday in May, 1857, to appoint an agent, fixing his compensation, whose duty it was made to visit the cities, villages and other places in the State which might be deemed eligible for the purpose, to receive donations and proposals for the establishment and maintenance of the university, and power was given the board, and it was made their duty, to fix its permanent location at the place where the most favorable inducements should be offered.

Lecturers, instructors and instructresses, together with other officers, were to be appointed by the board, their salaries fixed and their duties prescribed, with power to remove them, to prescribe the text-books, apparatus and furniture to be used in the university, and provide the same, and to recognize auxiliary institutions when deemed practicable, provided that such auxiliary institutions should not receive any appropriation from the treasury, or the seminary or university fund.   Each county in the State was entitled to the gratuitous instruction of one pupil, and each representative district to gratuitous instruction for a number of pupils equal to the number of representatives in each district, to be chosen in the manner prescribed in the act.

By section eight, the interest of the university and seminary fund, or such part of it as might be found necessary, was appropriated for the maintenance of the university, to be paid on the order of the board of education, from the treasury of the State, but in no case could any part of the interest of such fund be applied to the purchase of sites, or for buildings for the university.   By section nine, the board has power to appropriate $1,000, received from the Meriams of Springfield, Massachusetts, by the late superintendent (of public instruction) to

the purchase of apparatus for the use of the university when established, and it declares that hereafter, all gifts, grants and demises made to it, shall be applied in accordance with the wishes of the donors of the same.

The corporators named in the act were to hold their offices for six years, but to be determined by lot at the first meeting, so that one-third should hold their offices for two years, one-third for four years and one-third for six years. Vacancies to be filled by the governor and senate.

These are all the material parts of the act in question.

On the fourteenth of February, 1861, the legislature passed an act, entitled "An act to refund the interest on the college or university fund, and appropriate the same for the use of the State normal university," the preamble of which recites the compact of 1818, between this State and the United States, by which a certain percentage of the proceeds of the sale of the public lands lying within this State, was set apart to the State, to be appropriated by the legislature for the encouragement of learning, of which one-sixth part was to be exclusively bestowed upon a college or university. It then recites that the principal of this one-sixth of three per cent. of those proceeds, amounted on the first day of January, 1861, to the sum of $122,607.54, and the interest on it up to January, 1857, amounted to the sum of $98,956.82, and for the purpose of carrying out the intention of congress, and the understanding of the people, the legislature passed the act establishing the Normal University, and as no part of the principal or interest of this university fund, excepting the interest accruing since January 1, 1857, amounting to $19,905.03, had been bestowed on any college or university, but has been used by the State, therefore the governor was required to issue stock to the amount of $65,000, a part of the interest of this fund, payable to this board of education, for the use of the Normal University, and in sums not less than $1,000, each. Section three provides that this corporation shall have no power to sell or convey any of the property acquired since the passage of the act incorporating it, nor to create any debt or liability against the State, without

the express sanction, first to be given by the legislature. Section four provides that each county shall be entitled to gratuitous instruction for two pupils in the university, instead of one, as provided in the original act.

From this legislation the plaintiffs in error insist that the property of the normal university is the property of the State, in which the corporation have no interest whatever. That it was created for certain public purposes in which the whole State has an interest, and certain rights secured to each county in the State. That the governor, by and with the advice and consent of the Senate, appoints the trustees who compose the corporation. That the superintendent of public instruction is, *ex officio*, a member of the board and the secretary thereof, whose duty it is to report to the legislature the condition and expenditures of the university. The counsel also insists that the legislature have the absolute right to repeal or modify the charter, and that from the act of 1861 it is manifest it was not the intention of the legislature that the property held in the name of the board should be sequestered and sold by creditors or others. That the corporation is a mere trustee or agent of the State, to carry out the wishes and intention of the legislature, and its property can only be used for corporate purposes. He further contends that a creditor of the corporation is a creditor of the State, and has only the same rights as other State creditors.

The view we have taken, after mature consideration of this legislation, differs materially from that of the plaintiffs in error, and, though striving to do so, we have not been able to find, in either of these acts, any provisions on which to base such an opinion, or any power reserved to the legislature to repeal or modify this charter.

We regard this university as an eleemosynary institution, founded for the purpose of the gratuitous distribution of knowledge of the art of teaching and conducting common schools, and erected, not at the expense of the State, but of individuals. An agent was to be appointed by the corporation to visit the different cities, villages and other places in the State, deemed

eligible for the purpose, to receive donations and proposals for the establishment and maintenance of the university, and its permanent location was to be fixed at the place where the most favorable inducements were offered for that purpose.

The salaries of the instructors and other employees are fixed by the board, and no appropriation has ever been made from the State treasury for its maintenance. This is one feature which distinguishes it from our State institutions properly so called, such as the asylum for the blind, for the insane and for the deaf and dumb, for all which locations were selected by the State, buildings erected and furnished, teachers employed and appropriations made out of the public treasury at almost every session of the legislature, as the public acts show. It is true the State applied the interest of the university and seminary fund to aid in maintaining this university, but that interest did not belong to the State. The State held it as a mere trustee under the compact with the general government, and it was specially devoted by that compact to a college or university. The act of 1857 expressly provides that no part of this fund should be applied to the purchase of sites or for buildings for this university.

The sum of $1,000 "from the Meriams" we understand to have been a gratuity or donation for some educational purpose, and then in the hands of the superintendent of public instruction.

To the agent selected to visit different localities with a view to a proper site for the establishment and maintenance of this institution, the citizens of McLean county offered the most favorable inducements. They pledged property and funds amounting to $160,000 for a site and building, and so favorable was the offer, that the City of Bloomington, the capital of that county, was honored as the chosen spot, and upon the ground granted was reared, in part by the skill and means of the defendants in error, a magnificent structure, "the very best of the kind," as the board reported to the legislature, "in America, and perhaps in the world; perfect and harmonious in all its parts, and most admirably adapted to accomplish the

ends for which it was intended." This building, with the ground upon which it was erected, was a free gift by charitable individuals to the corporation, not to the State, and there cannot, therefore, exist any obligation on the part of the State to defray any of the expenses attending its erection. Its whole history shows it to be the result of private munificence.

The reason that the legislature reserved the appointment of the trustees was, doubtless, because it had placed in their keeping a fund of which the State was but a trustee, and morally responsible for its proper application, and over it a special custodian was placed, in the person of the superintendent of public instruction, whose duty it was to make reports to the legislature of the condition and expenditures of the university, and as some equivalent for this deposit of trust money, the State claimed and receives the gratuitous instruction of two pupils from each county, and for as many more as the whole number of representatives in the legislature might amount to, in the several representative districts. These pupils, it is understood, defray all their expenses, except for tuition, and are in no sense charity scholars, fed and provided at the expense of the State.

The provision in the act of 1861, that this corporation should have no power to sell or convey any of the property acquired since the passage of the act of 1857, nor to incumber it in any manner, can have no reference to the lien claimed in this case, since the lien was created before 1861, and under a charter which authorized the corporation to acquire, hold and convey, real and personal estate, and to contract and to be contracted with, to sue and be sued.

It is further urged by the plaintiffs in error, that it does not follow because this corporation can sue and be sued, that therefore a mechanics' lien will lie against the board, and instances the fact that counties and municipal corporations generally, may be sued, yet their property cannot be sold on execution, and citing the case of *The City of Chicago* v. *Hasley*, 25 Ill. 595.

The ground and reason of that opinion is distinctly stated in it, and to be, that such a proceeding against a municipal cor-

poration would break it up, and that possessing the taxing power which it can be compelled by mandamus to exercise, its debts can be paid and all its liabilities met in that mode. Creditors, as against such corporations, have this distinct and most efficient remedy. Not so with this corporation. The only remedy a creditor has against it, is by a judgment and execution, as in a case against an individual or other corporation not of a municipal character. Why should the power to sue and be sued, be conferred on this corporation if it could not be exercised by and against them? Why bring a suit against the corporation if the fruits of the judgment are not to be gathered?

The decree of the Circuit Court must be affirmed.

*Decree affirmed.*