Bradbury, J.
In 1814, The Cincinnati Lancas- • ter Seminary was incorporated, chiefly, for the purpose of instructing youth on a plan devised in England, late in the preceding century, by Joseph Lancaster; the most characteristic feature of which consisted in employing the more advanced pupils to impart instruction to those of a lower grade. The scheme was not successful, and in the year 1818, the institution being in a languishing condition, application was made to the legislature for a new incorporating act, which was passed on the 22d day of January, 1819, and reads as follows:
“Section 1. Be it enacted by the General Assembly of the State of Ohio, That Jacob Burnett, Francis Dunlavy, Samuel Johnson, William Lytle, Zaccheus Biggs, Joshua L. Wilson, O. M. Spencer, John Thompson, W. H. Harrison, Joseph H. Crane, Joshua Collett, Samuel W. Davis, Daniel Drake, William Corry, Jesse Hunt, Samuel Burr, John Reynolds, James Galloway, Martin Baum and Levi Jame's, and their associates, be, and they are hereby created and made a body corporate and pol *393 itic, with perpetual succession, who shall be known and distinguished by the name and style of ‘ The President, Trustees, and Faculty of the Cincinnati College;’ and by that name and style, they and their successors shall be a body in law, capable of contracting and being contracted with, suing and being sued, pleading and being impleaded, answering and being answered unto, defending and being defended, as natural persons are or may be, in all courts and places, and in all manner of suits, complaints, bills, causes and matters whatsoever. They shall have and use a common seal; they shall be capable of purchasing, receiving, holding and enjoying, and of granting, selling and conveying any estate or property, real or personal, necessary for promoting the object of this act of incorporation; which object is hereby declared to be the erection and maintenance of a college; provided, that the annual income, rents or receipts arising therefrom, shall not exceed eleven thousand dollars.
“Sec. 2. Be it further enacted, that the funds or stock of said college shall consist of five thousand shares, of twenty-five dollars each; which funds or stock shall be subscribed for in such manner and paid in at such times, in such proportions and under such regulations as may be prescribed by the by-laws and rules of said company.
“Sec. 3. Be it further enacted, that the affairs of said Cincinnati College shall be under the management of a board of trustees, which board shall consist of not less than thirteen, nor more than twenty members, to be elected by the shareholders on the last Friday of March, annually, between two and six o’clock in the afternoon, at the college edifice; and it shall be. lawful for the trustees to *394 continue in office, and to discharge the duties appertaining thereto, until their successors are elected and qualified.
‘£ Sec. 4. Be it further enacted, that all elections • shall be bjr ballot; at every election, each shareholder shall be entitled to one vote for every share of twenty-five dollars, until the number of shares, shall amount to five, and one vote for every five shares above five he or she may hold at the time of the election; but no trustee of the Miami University shall discharge the duties of trustee of The Cincinnati College.
“Sec. 5. Be it further enacted, that the board of trustees shall, at their first meeting after their election, elect a president and secretary of the board from their own body; they shall have the power of filling vacancies that may happen in the board during the period of their own appointment; they shall appoint a treasurer, who shall give bond and security for the faithful performance of his duty; they may elect a president and vice-president of the college, and may appoint such professors and tutors as they shall think necessary; which president, vice-president, professors and tutors may be removed at the pleasure of the board; they, may, from time to time, make and enforce such rules', regulations and by-laws for the government and well being of the college, as may seem to them proper; provided, they be consistent with the laws of the United States, and of this state; they may appoint a faculty to consist of the president, vice-president. professors, and such other persons as they may judge necessary, and may vest in the faculty so appointed, such powers as they may think expedient for the preservation of good order, and for enforcing obedience to the rules, regula *395 tions and by-laws of the institution; they may cause the principles of morality and of the Christian religion to be included, but the religious tenets that may be peculiar to any particular sect or denomination, shall never be taught or enforced in the college; they may hold their meeting’s at such times and places as they may designate and appoint,the president of the board may call a meeting’ at any time, when, in his opinion, it may be expedient; at any stated or special meeting of the board, seven members shall constitute a quorum for transacting business; the property and funds of the college shall be under the management and at the disposal of the board of trustees, by whom or by whose authority all contracts, purchases and sales shall be made; and, generally, the said board of trustees shall have power to do and perform all such matters and things as they may judge necessary for the benefit of said college; provided, that the funds of the institution shall not be applied to any use or for any purpose not herein expressed or intended.
“Sec. 6. Be it further enacted, that the board of trustees of the said eolleg’e, may grant and confer on any candidate in such form as they may direct, all or any of the degrees that are usually conferred in any colleg’e or university within the United States.
“Sec. 7. Be it further enacted, that so much of the act entitled, ‘An act to-incorporate The Cincinnati Lancaster Seminary, ’ as requires the appointment of a board of directors, be, and the same is hereby repealed; and that the board of trustees of the Cincinnati college, shall be, and they are hereby authorized to exercise all the powers granted by that act to the directors of The Cincinnati Lancas *396 ter Seminary; and it shall be lawful for the trustees of the Cincinnati colleg’e to apply the surplus funds of The Cincinnati Lancaster Seminary, to the use of the Cincinnati .eolleg’e; and in all respects to manage the affairs of the said seminary in the same manner as the board of directors are by law authorized to do.-
“Sec. 8. And be it further enacted, that Jacob Burnett, Joshua L. Wilson, Oliver M. Spencer, Daniel Drake, Levi James, Samuel W. Davis, William Corry, Francis Dunlavy, Samuel Johnson, William Lytle, Zaccheus Biggs, John Thompson, William H. Harrison, Joseph H. Crane, Joshua Collett, Jesse Hunt, Samuel Burr, John Reynolds, James Galloway and Martin Baum, shall be, and they are hereby appointed trustees of the Cincinnati college, who shall continue in office until the last Friday in March, next, and from thence until their successors are chosen.
“This act shall be subject to such alterations as the general assembly may from time to time see proper to make. ’ ’
One effect of this act was to vest in the corporation created by it, the property rights of The Cincinnati Lancaster Seminary, which rights ever since have been-and now in fact are, enjoyed by the body thus created. The object of this body, The Cincinnati College, as expressly declared by the first section of the incorporating act, is “the erection .and maintenance of .a college,” the act nowhere designating the nature of the instruction to be given, or the .method by which it was to be imparted.. The early transactions of the institution, from the plate of the incorporation, of The Cincinnati Lancaster Seminary in 1814, until its merger in The Cincinnati College in 1819, are *397 buried in obscurity, and but little more has been satisfactorily ascertained respecting its affairs after the incorporating act of 1819 was passed, until about the year 1845. However, it may be gathered from the record, that soon after The Cincinnati Lancaster Seminary was incorporated, it established, and for a time maintained, a school wherein both primary and academic instruction was given; that the school was not successful and soon began to languish. That in 1819, The Cincinnati Lancaster Seminary was superseded by The Cincinnati College, and the property of the former, of the value of about ten thousand dollars, transferred to the latter corporation, -and by the same act, the stock of the last named corporation was fixed at five thousand shares, of twenty-five' dollars each, a sufficient number of which were subscribed to add about forty thousand dollars to the funds received from The Cincinnati Lancaster Seminary.
Schools were maintained by the new institution until about the year 1825. After this date, for eight or ten years, whatever educational processes, if any, that may have been continued, were desultory and unsystematic. In 1835 additional shares of stock were subscribed, amounting- in the aggregate to about four thousand dollars, primary and academical education established, and a medical-school established. About the same time instruction in law was also begun. After a year or two, the medical school was discontinued and as early as 1845 or 1846 all attempts to impart- primary or academical instruction were abandoned, since which time a law school only has been maintained, except a course of philosophical lectures continued during a few years at a later period, and since *398 abandoned. The date when the law school was established is left uncertain, but probably it was in 1832; if not quite so early as that, yet it had had an uninterrupted existence of more than fifty years, when in the year 1892, the following statute was passed by the general assembly :
“An act to amend sections 3, 4 and 5, of an act entitled ‘ An act to incorporate The Cincinnati College,’ passed January 22, A. D., 1819, (17 Ohio L., Ch. 20, p. 46.
Whereas, in the act entitled ‘An act to incorporate The Cincinnati College, ’ enacted by the general assembly of the state of Ohio, January 22, A. D. 1819, by the eighth section thereof it was provided as follows, to-wit:
“This act shall be subject to such alterations as the general assembly may, from time to time, see proper to make; and,
“ Whereas, the endowment of The Cincinnati College as at present invested and managed, is not sufficient to enable it to carry'out the purposes of its charter; and,
“ Whereas, in the opinion of the general assembly, it would be advantageous to The Cincinnati College and to the University of Cincinnati, and to the public generally, that the government of the two institutions should be joined and consolidated; therefore,
‘ ‘Section 1. Be it enacted by the General Assemoh the State of Ohio, That sections 3, 4 and 5, of the act entitled ‘An act to incorporate The Cincinnati College, ’ passed the 22d day of January, A. D., 1819, be amended so as to read as follows:
“Sec. 3. The affairs of the said Cincinnati College shall hereafter be under the management of the directors, for the time being, of the Uni ver *399 sity of Cincinnati, which directors shall be, and they are hereby constituted the board of trustees of The Cincinnati College, and they are hereby authorized to exercise all the powers granted by law to the board of trustees of The Cincinnati College.
“Sec. 4. Be it further enacted, that the management of the funds, and of other matters belonging to or connected with the said Cincinnati College, shall be solely in the hands of the board of trustees aforesaid, and the said funds shall be administered for the purpose of carrying1 out the objects of the charter of The Cincinnati College, in connection with the funds and administration of the University of Cincinnati.
“Sec. 5. The board of trustees shall appoint a treasurer, who shall give bond and security for the faithful performance of his duty; they máy elect a president and vice president of the college, and may appoint such professors and tutors as they shall think necessary; which president and vice president, professors and tutors, may be removed at the pleasure of the board; they may, from time to time, make and enforce such rules, regulations and by laws for the government and well being of the college, as may seem to them proper; provided they be consistent with the laws of the United States, and this state; they may appoint a faculty to consist of the president, vice president, professors and such other persons as they may judge necessary and may vest in the faculty so appointed, such powers as they may think expedient for the preservation of good order, and for enforceing1 obedience to the rules, regulations and by laws of the institution; they may cause the principles of morality and of the Christian religion to be included, but the religious *400 tenets that may be peculiar to any particular sect or denomination, shall never be taught or be enforced in the college; they may hold their meetings at such times and places as they may designate and appoint; the president of the board may call a meeting at any time, when in his opinion it may be expedient; at any stated or special meeting of the board, a majority of the members shall constitute a quorum for the transaction of business; the property and funds of the college shall be under the management and at the disposal of the board of trustees, by whom, or by whose authority all contracts, purchases, and sales shall be made; and generally, • the said board of trustees shall have power to do and perform all. such matters and things as they may judge necessary for the benefit of the said college; 1provided, that the funds of the institution shall not be applied to any use, or for any purpose not herein expressed or intended.
“Sec. 2. Be it further enacted, that sections 3, 4, and 5 of the said act of January 22, 1819, entitled ‘An act to incorporate The Cincinnati College, ’ be, and the same are hereby repealed.
“Sec. 3. This act shall take effect and be in force from and after its passage.”
The constitutionality of this statute is assailed on a number of grounds, one of which is that it violates that provision of the nineteenth section of article I of the constitution of Ohio, which asserts that “Private property shall ever be held inviolate.”
Whether the statute is obnoxious to that constitutional provision depends, 1, whether it violates the property rights of The Cincinnati College, and 2, if it does so, whether that corporation is *401 entitled to the protection secured by the clause of the constitution of this state, above quoted.
No refined process of reasoning or unusual keeness of perception is required to ascertain the effect of this statute upon the property rights of The Cincinnati College. It simply and in unambiguous terms, abrogates these rights by transferring them to a body of strangers. No language that the court might use can make this • result more clear than does the concise language employed by the general assembly. The expressly declared reason for this legislative action is the assumed insufficiency of the property of The Cincinnati College, as managed by the present directory, to “carry out the purposes of its charter, ” and assuming further, that “ it would be advantageous to The Cincinnati College and to the University of Cincinnati, and the public generally, that the government of the two institutions should be joined and consolidated,” it seizes the entire property of the one and hands it over to the other of the two bodies. It is no answer to this to assert that the new directory represents the old corporation, or that the legal title to the property still remains in The Cincinnati College. The mere naked legal title to property has no value, when that title is absolutely severed from its control and beneficial enjoyment. It is the province and the duty of courts to look at the substance of a transaction, and to ignore refined and unsubstantial distinctions. And we can see no substantial difference between a statute which expressly creates a new corporation and endows it with the property of another body corporate, and a statute, like the one under consideration, which, finding a corporation already existing, vests *402 in the directory of the latter all the powers and rights of property which had belonged to another corporate body. And whether we regard the corporation as the actual and potential proprietor of the property in contention, or whether we consider those who contributed to or created this fund or property as such proprietors, and the corporation a mere agency, created to represent them and carry their will into .execution, is immaterial in this connection. For, if the corporation is the real owner, it has been deprived of its use and enjoyment of its property, while if those who originally created the fund are the real owners, then without their consent and against their will, it has been taken from their chosen ag’ents, and placed in the custody and management of others, whom they did not appoint and over whom they have no control. - Property in the hands of an agent is just as inviolate as that in the custody of the owner himself. As long’ as the principal may choose and control his agent, his dominion of the property confided to the agent continues, but this dominion, or proprietorship, is at once destroyed the moment that his property is forcibly, and against his will, seized, and absolutely and irrevocably transferred to another agent, selected not by the owner, but by some other person or authority.
We have seen that the statute under consideration has taken from the control and management of The Cincinnati College all of its property and placed it under the control and management of the University of Cincinnati. One ground, as we understand the argument of counsel, upon which this result is maintained to be lawful, is that the purpose to which this property was devoted by its original donors is a public purpose, *403 and therefore, that circumstance alone is sufficient to impress upon the property a public character; but if that is not so, yet as the purpose of the donors was not private gain, but public charity, and as - the property under the new corporation would be applied to the same purpose to which The Cincinnati College would have applied it, had the latter continued its administration, that therefore no substantial right, either of the original donors or of the corporation, was violated by the law. That in fact the- only rights the original donors had, as the - result of their contribution to the funds of The Cincinnati College was that of voting’ for directors of the concern, which was “no more property than the privilege and duty of a citizen to vote for a governor of state, or presidential electors, are property.”
The results of establishing this doctrine would be to place every eleemosynary corporation' within the state, whether religious, educational, or created to administer to the wants of the suffering or needy, beyond the limits of constitutional protection. Whenever, in the opinion of a majority of the general assembly, the public interest, or the interest of two or more colleges, or churches, or other private or eleemosynary corporations, required them to be united, the property of one or more of them could be seized and transferred to another.- The doctrine finds no support in any treatise or -adjudication within our knowledge, nor by reason or justice. There are two classes of public charities, one where the institutions are public in the broadest sense of that term, that is, they are owned by the state, or some subdivision thereof created for governmental purposes, and maintained at the public expense. These institu *404 tions are absolutely-under the control and management of the public through its proper representatives. As - respects them no vested or private rights pertain. It does not follow, -however, that because this class of public charitable institutions are the subjects of absolute public control, that another class, whose property consists of private donations and to which the organized public has contributed nothing* shall-also be subjected to such absolute governmental control because the charity they administer has been christened a “public charity” in legal nomenclature. In common-.acceptation; colleges are not “charitable institutions,” although in law they administer a public charity. This, means no more than that the public are incidentally benefited by the education of some of its members, the immediate advantage accruing to the individual members who have received instruction.
The unbroken current of authority declares that the property of such institutions is private property, and the corporations themselves private corporations. Dartmouth College v. Woodward, 4 Wheaton, 518; Vincennes University v. Indiana, 14 Howard (U. S.), 269; Inhabitants of Yarmouth v. Inhabitants of N. Yarmouth et al., 34 Me., 411; Trustee v. Salmon, 11 Me., 114; Trustees v. Foy, 1 Murph. (N. C.), 58; State ex rel. Pittman et al. v. Adams et al., 44 Mo., 570; Downing et al. v. The Indiana State Board of Agriculture, 129 Ind., 443; Board of Education v. Greenebaum, 39 Ill., 609; Board of Education v. Bakewell, 122 Ill., 339; Montpelier Academy Trustees v. George et al., 14 Louisiana, 395.
When the donors of property devote it to a charitable purpose and choose an existing, or create a *405 new corporation as an instrument by which this purpose is to be effected, they make this instrument their perpetual representative, for that purpose. “These gifts were made, not indeed to make a profit for the donors or their posterity, but for something in their opinion of inestimable value; for something which they deem a full equivalent for the money with which it was purchased. The consideration for which they stipulated, is the perpetual application of the fund to its object, in the mode prescribed by themselves. Their descendants may take no interest in the preservation of this consideration. But in this respect their descendants are not their representatives. They are represented by the- corporation. The corporation is the assignee of their rights, stands in their place, and distributes their bounty, as they would themselves have distributed it, had they been immortal. ’ ’ Dartmouth College v. Woodward, 4 Wheaton, 642.
Whether The Cincinnati College is regarded as the owner in its own right of the property donated to it, or as the representative of the donors, charged with the execution of their purpose, is not material; in either view the property is private as contradistinguished from public, and as such is within the protection of that provision of the constitution which declares private property to be inviolate.
We now come to the consideration of the provision in the charter of The Cincinnati College, which reserves to the general assembly the right of amendment. This reservation would be wholly unnecessary if The Cincinnati College had no rights of property which the general assembly was bound to respect. If the legislature, at its will could *406 divest this corporation of its property, the legislative-control of the institution would be absolute, for by taking away its entire property rights, all effectual corporate action would be at once paralysed. Thenceforward it would be powerless to advance the purposes of its creation.
The authorities agree in holding that the legislative power of amendment and alteration thus reserved in charters, is not absolute, although its .boundaries are not yet established. In Kentucky this- power of amendment seems to be limited to those matters which concern the ■ relations established by the charter between the corporation and the .state.
■ “The power,to alter or amend the contract, in our conception, is to change it as betiveen the original pa/rties, and such others only, as have been permitted, by their mutual consent,. to come into the enjoyment of its benefits and privileges; not to compel one of the parties to operate in conjunction with others, and share with them the privileges and benefits of the contract.” Sage v. Dillard, 15 B. Monroe, 359.
• Whatever difficulties have been encountered by the courts in ascertaining’ -the limits of this -reserved legislative power,, they concur in denying that under it, the legislature can strip a corporation of its rights of property.
"The power of alteration and amendment is not without limit. The alterations must be reasonable; they must be in. good faith, and be consistent with the scope and object of the act of incorporation. -Sheer oppression and wrong cannot be inflicted under the guise of amendment or alteration. - Beyond the sphere of the reserved powers, the vested rights of property of corporations in such cases are *407 surrounded by the same sanctions and are as inviola• ble as in other cases.” Shield v. Ohio, 95 U. S., 324; Detroit v. Plank Road Co., 43 Mich., 140; Orr v. Bracken Co., 81 Ky. Rep. 593.
The Cincinnati College was the lawful owner of the property in its possession; it is immaterial whether it was acquired from The Cincinnati Lancaster Seminary that it succeeded, or by subscriptions and donations subsequently made. This property had been intrusted to it for the purposes of establishing and maintaining a “college,” no specific branches of learning were prescribed, or method of instruction commanded. Primary, academical, medical, legal and philosophical courses were from time to time attempted; all of them except the law school, proved unsuccessful and were abandoned; the latter has been continuously and successfuly maintained for nearly sixty years, and substantially the entire income of the institution during that period has been devoted to its maintenance and improvement, without material objection appearing to have been made by any one of the donors. The facts that such donors of the property to this institution, gave it with knowledge that- no specific branches of learning or method of instruction were prescribed by its charter, together with the brief history of its various educational attempts and failures just adverted to, and the acquiescence of such donors therein, tend to show that these donors entrusted to this chosen instrument of their will a wide discretion respecting the course and method of instruction to which their donations were to be, devoted, and if good faith is to be kept with these donors, we must deny to the legislature the powers to seize the fund thus raised, and transfer it from *408 these chosen agents to others, in whose discretion they did not confide. This power, we think is prohibited by section 19,' of article I, of the constitution of 1852, which declares the inviolability of private property. This conclusion makes the consideration of the other questions raised in argument unnecessary.

Judgment affirmed.