# CITY OF WINONA v. BOTZET.

## SAME v. NICHOLS.

(Circuit Court of Appeals, Eighth Circuit.   March 26, 1909.)

Nos. 2,840, 2,841.

1. MUNICIPAL CORPORATIONS (§§ 733, 852*) — GOVERNMENTAL FUNCTIONS — NEGLIGENCE.

The city of Winona maintained a shrill, startling steam whistle on its waterworks building within 110 feet of its bridge across the Mississippi river, which was 40 feet in height at that point. This whistle was connected with its fire-alarm system, so that it gave notice automatically by its blasts of fires and their location when an alarm was sent in. The city directed the engineer of its waterworks to blow this whistle daily by hand at 5 p. m. to give notice to union men and its employés of the end of their day's work. There was substantial evidence that the blasts from this whistle had frightened horses traveling on the bridge for years before this accident. As Nichols was driving his horses over the bridge at a point about 110 feet from the whistle at 5 p. m., the assistant engineer of the waterworks blew a blast of the whistle which frightened his horses, caused them to run away, to throw him and a girl who was riding with him to the ground below, and to kill him and injure her.

*Held:* (1) The whistle was not blown in the exercise of the city's power to protect itself and its inhabitants against fires, but in the exercise of its power to maintain waterworks and to care for its own property.

(2) There was substantial evidence that it failed to discharge its duty to so use its property as to do no unnecessary damage to others, and its duty to use reasonable care to keep its bridge reasonably safe for travelers.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1547–1549, 1809;  Dec. Dig. §§ 733, 852.*]

2. NEGLIGENCE (§ 125*)—EVIDENCE OF PRIOR SIMILAR ACCIDENTS COMPETENT.

In an action for damages caused by frightening horses on a highway by the blast of a whistle, evidence that tractable and gentle horses had been frightened previously by blasts of the same whistle under similar circumstances was competent.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 241;  Dec. Dig. § 125.*]

3. NEGLIGENCE (§ 136*)—QUESTION FOR JURY UNLESS BUT ONE FINDING SUSTAINABLE.

It is only when the material facts and the rational inferences from them are so clearly established that but one finding would be sustained by the court that the question of the negligence of the defendant is for the court.  Evidence considered, and *held* sufficient for the consideration of the jury.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 257–353;  Dec. Dig. § 136.*]

4. NEGLIGENCE (§§ 56, 58, 62*)—"PROXIMATE CAUSE"—"INTERVENING CAUSE" —FACTS—CONCLUSION.

The proximate cause of an injury is the primary moving cause without which it would not have been inflicted, and which in the natural and probable sequence of events, without the intervention of any new and independent cause, produces the injury.

The intervening cause which will relieve of liability for an injury is an independent cause which intervenes between the original wrongful act or omission and the injury, turns aside the natural sequence of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

events, and produces a result which would not otherwise have followed and which could not have been reasonably anticipated.

The blast of a whistle frightened horses on a bridge, they ran, the tugs came unhooked, the tongue slipped from the yoke, fell to the bridge and broke, the wagon box crashed against the railing, threw the occupants over it to the ground, and injured them.

*Held:* The blast of the whistle was the proximate cause of the injuries, and the subsequent events preceding the injuries were dependent upon and caused by it.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 69, 71, 76–79; Dec. Dig. §§ 56, 58, 62.*

For other definitions, see Words and Phrases, vol. 6, pp. 5758–5769; vol. 8, p. 7771.]

5. Negligence (§ 66*)—Assumption of Risk—Knowledge and Appreciation of the Danger Essential.

Notice or knowledge and appreciation of the danger are indispensable to an assumption of the risk of it.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 86–89; Dec. Dig. § 66.*]

6. Negligence (§§ 122, 136*)—Contributory Negligence—Burden of Proof—Instruction of Guilt when Permissible.

The burden of proof to establish the contributory negligence of the plaintiff is upon the defendant.

It is only when the evidence of it is so clear that the court would not sustain a finding to the contrary that it is the duty of the court to instruct the jury that the plaintiff was guilty of it. Evidence considered, and *held* for jury.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 221–223, 226–234, 333–346; Dec. Dig. §§ 122, 136.*]

7. Negligence (§ 93*)—Driver's Negligence Not Imputed to Passenger.

The negligence of the driver of a vehicle may not be imputed to a passenger who is riding with him without charge or compensation.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 147–150; Dec. Dig. § 93.*]

8. Municipal Corporations (§§ 764, 847*)—Bridges (§ 37*)—Negligence—Duty to Keep Bridge Safe and Use Property with Care Extends Beyond Limits of Bridge and Property.

The duty of a city to exercise reasonable care to keep its bridge or street reasonably safe for travelers is not limited to acts of commission and omission within the limits of the bridge or street, but extends to those outside the bridge or street that render it unsafe for travelers.

The duty to so use its own property as to do no unnecessary injury to others extends to effects produced by the use beyond the limits of its property.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1616–1620; Dec. Dig. §§ 764, 847;* Bridges, Cent. Dig. §§ 103–105; Dec. Dig. § 37:*]

9. Municipal Corporations (§ 755*)—Bridges (§ 35*)—Damages—Injuries to Persons.

Damages sustained by injuries to persons as well as to property are recoverable for a breach of these duties.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1587, 1589, 1590; Dec. Dig. § 755;* Bridges, Cent. Dig. §§ 80, 96, 98; Dec. Dig. § 35.*]

10. Nuisance (§ 6*) — Public Nuisance — Unauthorized by Legislative Grant Where Unnecessary for its Enjoyment.

Where the use and enjoyment of a legislative grant does not necessarily and naturally create a nuisance, but the nuisance results from the method

---

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the use and enjoyment, the grant is no defense to an action on account of the creation or continuance of the nuisance or its effects.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. §§ 35-37; Dec. Dig. § 6.*]

11. MUNICIPAL CORPORATIONS (§§ 57, 745½*)—GOVERNMENTAL AND PRIVATE OR CORPORATE POWERS—CITIES EXEMPT FROM LIABILITY FOR EXERCISE OF FORMER, SUBJECT TO LIABILITY FOR EXERCISE OF LATTER—"PUBLIC POWERS"—"PRIVATE POWERS."

Municipalities have two classes of powers, the one political, public, in the exercise of which they govern their people and act as delegates of the state, the other private, business, in the exercise of which they act for the advantage of their inhabitants and themselves.

They are not liable for damages for the acts and omissions of their officers and agents in the exercise of the former. But they are liable for damages for the wrongful and negligent acts and omissions of their officers and agents within the scope of their authority in the exercise of the latter.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 144, 1568, 1569; Dec. Dig. §§ 57, 745½.*

Liability for torts of public officers, see note to City of New York v. Workman, 14 C. C. A. 534.]

12. MUNICIPAL CORPORATIONS (§ 747*)—POWER TO CONSTRUCT AND MAINTAIN WATERWORKS A BUSINESS POWER.

The municipal power to construct, maintain, and operate waterworks is a private or business power, and a city is liable for damages caused by the wrongful or negligent acts and omissions of its officers and agents in the exercise of that power to the same extent as a private corporation or individual.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1572; Dec. Dig. § 747.*]

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Minnesota.

At 5 o'clock in the afternoon of a cold blustering day in January, 1907, the assistant of the engineer of the waterworks of the city of Winona blew a steam whistle on the waterworks building for the purpose of notifying union men and city employés that their workday was over, and thereby scared a team of horses which James N. Nichols was driving about 110 feet distant from the whistle over the city's bridge across the Mississippi river, so that they ran away, threw him and Irene Botzet, a schoolgirl 13 years old who was riding with him, over the railing of the bridge to the frozen ground 40 feet below, killed him, and seriously injured her. Mary Alice Nichols, the administratrix of his estate, brought an action against the city for alleged negligence in causing the death of Mr. Nichols in this way. August Botzet, the father of Irene, brought an action against the city for alleged negligence in causing the injuries to her. The two causes were tried together, and resulted in judgments for the plaintiffs, of which the city complains.

For more than 20 years the city of Winona has maintained waterworks, and as a part thereof a building in which the pumping engines are located and operated. It has also maintained an organized fire department under legislative authority. In 1888, under this authority, it installed an electric fire-alarm system, and as a part of it a 12-inch fire whistle, which it placed on the roof of the waterworks building, and which automatically notified the members of the fire department and others by its blasts in what part of the city a fire was whenever an alarm was sent in from any one of some 60 fire-alarm boxes scattered throughout the city. This whistle, including the fire-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

alarm system, was tested three times a day, so that it gave forth many blasts, sometimes about 100 in a day. After this whistle and fire-alarm system had been established, and in 1891, the city of Winona, under authority conferred upon it by the Legislatures of Minnesota and Wisconsin, constructed and has maintained ever since a toll bridge across the Mississippi river for the use of pedestrians, teams, and carriages. It constructed this bridge in such a way that the driveway of the approach to it upon the Minnesota side started on an easy ascent at the intersection of Second and Main streets in Winona, ran north on Main street about 400 feet, then turned and ran west one block of 300 feet to Johnson street, where it was at least 45 feet above the ground. At that point the driveway turned and ran east across the river about 300 feet to a point where it connected with a pile bridge and a road leading across the Wisconsin bottoms. Where the roadway turned east on the Minnesota side it was not more than 110 feet distant from the steam whistle on the waterworks building, which was in a plane not more than 15 feet below it. The roadway of the bridge was provided with a sidewalk on one side of it 6 feet in width, a driveway for carriages 18 feet in width, and substantial wooden railings 4 feet 2 inches in height.

In May, 1905, the city council of Winona, on a petition of the trades and labor council, adopted a recommendation of its fire committee that this fire whistle should be blown at 5 in the afternoon to notify mechanics and others when their workday ceased. Thereupon the water commissioner directed the engineer of the waterworks to blow this whistle at that hour each day, and he did so by means of a cord attached to the valve from that time until the injuries were inflicted which resulted in these actions.

By chapter 165, p. 238 of the General Laws of Minnesota, 1903, the management of the waterworks was transferred on May 1, 1906, to the board of municipal works of the city of Winona; but that board gave no directions concerning the blowing of this whistle, and the engineer who continued in charge of the waterworks building continued to blow the whistle as before.

The blast of this whistle was produced by a steam pressure of about 100 pounds to the square inch, and it sent forth a shrill, startling sound which could be heard 5 miles, and much farther under favorable conditions. In the discharge of its function as a fire whistle it was blown automatically by the action of the fire-alarm system. But in the discharge of its function as a time whistle it was blown by hand by the engineer of the waterworks, or his assistant, who pulled the valve open by means of a cord attached to it. Gentle and tractable horses had been scared by the blasts of this whistle and had attempted to run away while they were traveling upon the bridge, and this had occurred many times during the preceding nine years. Mr. Nichols was a dairyman who lived about 12 miles distant from Winona in the state of Wisconsin, and who had been accustomed for four years to drive over the bridge once a week and sometimes more frequently, so that he probably knew that the whistle sounded for fire alarms; but the evidence does not indicate whether or not he was aware that it blew at five in the afternoon. He drove into Winona on the morning of the day of the accident a pair of young horses, four and five years old, and started to return about 5 o'clock in the afternoon. Irene Botzet, a schoolgirl who lived in Wisconsin and attended school in Winona, asked him for a ride across the bridge, and he granted her request. As he drove up the approach of the bridge toward the turn near the whistle, he was holding his horses down to a slow walk so that another team walked past him. There were then two teams in front of him on the bridge, and he was following. Just after he arrived at the turn of the driveway to the east the steam whistle blew, and his team, and that next in front of him, began to run. He held onto his horses and guided them past the two teams in front of him, but one, and a little later two more, of the tugs in his harnesses unhooked, the end of the tongue slipped out of the yoke, dropped, and broke, the horses ran on, drove the end of the broken tongue against the guard rail, raised the box on which the occupants were sitting, and threw them over the railing to the frozen ground on the Wisconsin side 40 feet below. The court submitted to the jury the questions, was the city guilty of negligence which was the proximate cause of the injuries inflicted by the runaway, and were the victims guilty of negligence which

contributed to cause these injuries? and the jury answered the former in the affirmative, and the latter in the negative.

W. J. Smith (Richard A. Randall and Tawney, Smith & Tawney, on the brief), for plaintiff in error.

Edward Lees and M. L. Fugina (M. B. Webber, on the brief), for defendants in error.

Before SANBORN, VAN DEVANTER, and ADAMS, Circuit Judges.

SANBORN, Circuit Judge (after stating the facts as above). The city of Winona is a municipal corporation created, endowed with its powers, and charged with its duties by the Legislature of the state of Minnesota. The character and the limits of the powers and liabilities of such corporations are questions of local law, upon which the decisions of the highest judicial tribunals of the states which create them are authoritative in the national courts, because these questions are determinable by the construction of the constitutions and statutes of the states under which the municipalities are organized. Detroit v. Osborne, 135 U. S. 492, 499, 10 Sup. Ct. 1012, 34 L. Ed. 260; Claiborne County v. Brooks, 111 U. S. 400, 410, 4 Sup. Ct. 489, 28 L. Ed. 470; Madden v. Lancaster County, 12 C. C. A. 566, 570, 65 Fed. 188, 192; Blaylock v. Incorporated Town of Muskogee, 54 C. C. A. 639, 640, 117 Fed. 125, 126. So far, therefore, as the Supreme Court of Minnesota has decided the extent of the powers and liabilities of municipal corporations, those decisions must control in this case. The opinions of other courts become immaterial, and it will be unnecessary to notice or consider them.

Under the decisions of the Supreme Court of Minnesota municipal corporations are charged with the duty to exercise ordinary care to make and to keep their roads, streets, and public ways reasonably safe for travelers thereon, and also with the duty to exercise reasonable care to so use their property and rights as to inflict no unnecessary injury upon persons or upon their property. Shartle v. City of Minneapolis, 17 Minn. 308 (Gil. 284); Blyhl v. Village of Waterville, 57 Minn. 115, 58 N. W. 817, 47 Am. St. Rep. 596; Wiltse v. City of Red Wing, 99 Minn. 255, 260, 109 N. W. 114.

The bridge across the Mississippi river on which this accident occurred is a public highway, and the city of Winona is liable for negligence in its maintenance and care to the same extent as it is for negligence in the care and maintenance of its public streets. Willis v. Winona City, 59 Minn. 27, 60 N. W. 814, 26 L. R. A. 142. With these established rules in mind, let us consider the complaints concerning the trial of these cases.

The first specification of error presented is that the court received in evidence the petition of the Trades and Labor Assembly that the fire whistle be blown daily at 5 in the afternoon, the action of the city council of the defendant in May, 1905, granting that petition, and the curfew ordinance passed in January, 1906, whereby the engineer of the waterworks was directed to designate 9 in the afternoon each day by nine short blasts of the whistle; and the argument is that, inas-

much as on May 1, 1906, the management of the waterworks building passed to the board of municipal works, the water commissioner, who in May, 1905, directed the engineer to comply with the order of the council, then went out of his office, and the board never gave the engineer any direction on the subject thereafter, these acts of the common council were immaterial. But the question at issue was, did the city exercise ordinary care to keep the bridge reasonably safe for travelers, and to use its waterworks and steam whistle so as to inflict no unnecessary injury upon the persons or property of travelers over the bridge? The acts of the council which were introduced in evidence clearly indicated the degree of care the city was exercising in the use of this whistle, and for that reason they were not immaterial. Again, the act of the city council which directed the blowing of the whistle at 5 in the afternoon unquestionably gave the engineer the authority and the direction of the city of Winona to blow it at that hour until that authority was revoked or an inconsistent instruction was given to him by the city. The same engineer remained in charge of the waterworks building and of the whistle after the control of them was transferred to the board of municipal works, and he undoubtedly had the same authority to blow the whistle thereafter that he had to continue to run the engines and to pump the water through the city. His authority continued until it was revoked. Moreover, this action of the council in connection with the continued blowing of the whistle subsequent to May 1, 1906, was competent, and persuasive evidence of the alleged negligence of the board of municipal works, for the board must have been aware that the whistle was being blown after it came into control of the waterworks, and it did not stop it, and by the express terms of the act under which it was created the city is liable for its acts of commission and omission within the scope of its authority. Gen. Laws Minn. 1903, p. 241, c. 165; Kleopfert v. City of Minneapolis, 90 Minn. 158, 160, 95 N. W. 908; Barnes v. District of Columbia, 91 U. S. 540, 545, 551, 555, 23 L. Ed. 440; District of Columbia v. Woodbury, 136 U. S. 450, 10 Sup. Ct. 990, 34 L. Ed. 472. There was no error in the admission of the acts of the city council.

It is assigned as error that the court permitted the introduction in evidence of testimony that other horses of ordinary gentleness and tractability were frightened while traveling over this bridge by the blasts of this steam whistle at various times during nine years preceding the accident in question. The reasons urged in support of this specification of error are: (1) That Nichols' horses were frightened by a single blast of the whistle, five seconds in duration, while the horses of the witnesses were scared by several blasts in quick succession caused by the automatic action of the fire-alarm system, but it was evidently the first sudden sound that tended to frighten the horses far more than its subsequent repetition; (2) that the first blast is not at its commencement as loud as it becomes later, because there is at first stationary steam in the pipe which must be started forth, but there could have been no very substantial difference in the blasts on that account, because the steam pressure was constantly from 85 to 110

pounds to the square inch, and that pressure necessarily must have produced almost instant action and sound when the valve was released; and (3) because the defendant was charged with liability for the effect of the blast which it directly caused, so that this evidence was not necessary or competent to prove notice to the city of its dangerous character, and because this evidence introduces a collateral issue. But the main issue in this case was whether or not the blasts of this whistle were of such a character that a person of ordinary intelligence and prudence would have anticipated the frightening of horses traveling upon the bridge, and their rapid flight as the natural and probable effect of the blast. If these blasts were of that character, the production of them was actionable negligence; if they were not, it was not actionable negligence to make them. There were but two ways in which that question could be determined. It must be determined by the opinions or speculations of witnesses, or by the experience of those who had actually tried it. The latter is certainly more persuasive and convincing and more likely to accord with the fact than the former. The material conditions under which the horses of the witnesses were frightened were substantially the same as those under which the accident happened. They were scared while they were traveling upon the same bridge upon which the horses of Nichols were frightened. They were terrified by the same whistle located in the same place at the same distance from the bridge, and the testimony of the witnesses who were driving or observing these animals that gentle and tractable horses had been frightened while they were traveling upon this bridge by the blasts of this whistle at various times preceding the accident was upon both reason and authority material and persuasive evidence that these blasts were of a character likely to frighten horses under such circumstances, that their fright and flight were natural and probable consequences of the production of the blasts, and that these facts were so notorious that they might be considered by the jury to constitute notice to the city of the dangerous character and probable effects of the blowing of this whistle. Darling v. Westmoreland, 52 N. H. 401, 13 Am. Rep. 55; Nye v. Dibley, 88 Minn. 465, 93 N. W. 524; District of Columbia v. Armes, 107 U. S. 519, 525, 2 Sup. Ct. 840, 27 L. Ed. 618; C. & N. W. Ry. Co. v. Netolicky, 14 C. C. A. 615, 622, 67 Fed. 665, 672; Wigmore on Evidence, § 458, subd. 2; Chicago Great Western Ry. Co. v. McDonough, 161 Fed. 657, 667, 88 C. C. A. 517.

Counsel for the city argue that the refusal of the court to instruct the jury to return a verdict in its favor was error: (1) Because there was no lack of care in the construction and the maintenance of the bridge, and the city was not liable for injuries caused by its acts of commission or omission outside of that structure; (2) because the whistle was blown for a governmental and not for a private or corporate purpose, and the city is exempt from liability for acts so done, and the rights of the injured were not thereby infringed; (3) because the location and the use of the whistle were discretionary with the city, and the exercise of that discretion was not reviewable by the courts; (4) because the act of blowing the whistle to indicate the

time of day was beyond the corporate power of the city; (5) because there was no evidence of the city's negligence, or that its negligence was the proximate cause of the injury, and the persons injured assumed the risk of the blast of the whistle; and (6) because Nichols was guilty of contributory negligence, in that his whiffletree hooks were not in such a condition that they prevented the tugs from becoming unhooked while his horses were running away.

It is only when the material facts and the rational inferences from them are so clearly established that but one finding from them would be sustained by the court that the duty is imposed upon it to withdraw the question of the causal negligence of a defendant from the jury. Grand Trunk Ry. Co. v. Ives, 144 U. S. 408, 417, 12 Sup. Ct. 679, 36 L. Ed. 485; Chicago Great Western Ry. Co. v. Price, 38 C. C. A 239, 243, 97 Fed. 423, 427. Ten witnesses testified to 13 occasions within 9 years preceding this accident upon which gentle and tractable horses upon this bridge near the turn where Nichols was when the whistle blew had been frightened by blasts of this whistle, and had jumped or run or turned around. One witness testified that his horse was so terrified that he jumped and broke the shafts of his buggy, another that his horses were so scared that they ran and tore the yoke near the tongue and broke a strap from the evener, still another that his horses were so frightened that they ran and caused a tug to unhitch, and another still that his horses were so terrified that they ran while he was driving them so that they threw his wife out of his wagon and injured her. At the time of this accident Losinski was driving the leading team across the bridge, Duff the second team, and Nichols was either holding his team stationary or at a slow walk very near the turn of the bridge when the whistle blew. Losinski testified that his horses immediately jumped and became frightened, but he held them. Duff testified that Nichols stopped his horses near the turn to let him pass, that he passed Nichols, that the latter's horses were then quiet, that just after he passed him the whistle blew, that the moment it blew both teams were on the dead run, that his horses were gentle, but they were frightened, ran, and jumped and nearly got away. This was substantial and persuasive evidence that the blowing of this whistle was likely to frighten horses passing it on the bridge, that it rendered the bridge unsafe for drivers of teams thereon, and that, in the light of the evidence that the sound it gave forth was shrill, startling, "awful loud," and could be heard from 5 to 10 miles, this fact was so notorious that a jury was warranted in finding that it must have been known to the city, and that a person of ordinary prudence and intelligence would have anticipated as its natural and probable result the fright and flight of passing horses and serious injuries to those who should be drawn by them.

Nor can the contention be sustained that the unhooking of the tugs, the breaking of the pole, or any of the other events between the blowing of the whistle and the injuries and death was, and the blast of the whistle was not, the proximate cause of those dire effects. The proximate cause of an injury is the primary moving cause without which it would not have been inflicted, but which, in the natural and

probable sequence of events, and without the intervention of any new or independent cause, produces the injury. The intervening cause that will insulate the original wrongful act or omission from the injury and relieve of liability for it must be an independent, intervening cause which interrupts the natural sequence of events, prevents the ordinary and probable result of the original act or omission, and produces a different result which could not have been reasonably anticipated. Union Pacific Ry. Co. v. Callaghan, 6 C. C. A. 205, 210, 56 Fed. 988, 993, 994; Cole v. German Savings & Loan Soc., 59 C. C. A. 593, 597, 600, 124 Fed. 113, 117, 120, 63 L. R. A. 416. The blast of this whistle was the primary moving cause without which the accident would not have happened. It was the cause which set in motion all the other events, the cause which set the horses into a dead run, made them uncontrollable, brought about the unhooking of the tugs, the breaking of the pole, the crash of the wagon against the railing, and the throwing of its occupants to the ground below. All these intermediate acts were dependent, not independent, causes. They were mere links in the chain of causation between the blowing of the whistle and the injuries and death it produced, and were themselves caused by the blast of the whistle.

There is a statement in the brief that Nichols and Irene Botzet knew that the whistle was blown daily at 5 in the afternoon and that they assumed the risk of injury from it. The place in the record where the evidence that they had this knowledge may be found is not pointed out, and a search of the record for it has proved vain. The transcript, however, does show that Irene testified that she did not know that the whistle blew at 5 o'clock, and that just as Nichols was approaching the turn of the bridge nearest to the whistle a few seconds before 5 o'clock he held his horses to a walk while Losinski passed him, and then stopped them very near the turn while Duff passed him, and then it was 5 o'clock, the whistle blew, the two rear teams ran instantly, and the injuries and death followed. It is difficult to believe that Nichols would have walked and then stopped his horses at the most dangerous place on the bridge at 5 o'clock in the afternoon if he had known that the whistle blew daily at that hour, when he might just as easily have driven them on and been a few hundred feet distant when the blast came.

Notice or knowledge and appreciation of the danger are indispensable to the assumption of the risk of it (Chicago Great Western Ry. Co. v. Price, 97 Fed. 423, 38 C. C. A. 239, 247), and the evidence that the victims of this accident knew and appreciated the danger from the blast of the whistle was far from being so conclusive that it was the duty of the court to instruct the jury that they assumed the risk of it.

The burden was upon the defendant to prove contributory negligence, and it was the duty of the court to instruct the jury that Nichols and Irene were guilty of it, only in case the evidence of it was so clear that the court would not sustain a finding to the contrary. The evidence upon this subject was the testimony of one witness who said that some days before the accident he rode with Nichols behind the

team which ran away, and they were hitched up so loosely that he was of the opinion that Nichols was negligent in that regard; the testimony of Losinski that when Nichols' horses had run ahead of him three or four rods he saw that one of his tugs was unhooked and one was hooked; the established fact that at some time during the run all but one of the tugs became unhooked; the testimony of two witnesses that they were of the opinion that if three tugs came unhooked at the same time the horses could not have been properly hooked up; and the testimony of the livery man, who unhitched the horses when they came into Winona and assisted Nichols to hitch them up when they started out of Winona on the day of the accident, that they were properly hitched up when they came in and when they went out, that the hooks, the harnesses and the straps were strong and right, and that the horses were so hitched up that the tongue of the sled could not slip out of the yoke. Since it does not appear that Nichols knew that the whistle was to blow at 5 in the afternoon, no duty was imposed upon him to so harness his horses that its blast and the fright and flight it caused would not unhitch his tugs, break his tongue and his harnesses, and even if he had been aware of the coming blast the evidence in this case was far from conclusive that he failed to fairly discharge the duty he would have owed. The evidence that he exercised reasonable care was the testimony of an eyewitness. The testimony that he failed to exercise such care was inference and opinion from more remote facts, and the refusal of the court to disregard the positive testimony and withdraw this question from the jury was not error.

There was no evidence in the cases that Irene Botzet was guilty of any contributory negligence, and, even if Nichols had been guilty of it, his negligence could not have been imputed to her. Union Pacific Ry. Co. v. Lapsley, 51 Fed. 174, 2 C. C. A. 149, 152, 16 L. R. A. 800.

The city concedes that it might be liable for defects and obstructions within the limits of the roadway of the bridge which rendered that highway unsafe for travelers, but its counsel insist that it was not liable for the blowing of its whistle although it rendered the bridge unsafe, because the whistle and the blowing were beyond the limits of the bridge; and they argue that the declaration of the court below that the city was not liable in this case if the horses were frightened by the whistle of a locomotive of a railroad company sustains their position. But the city was not liable for the blast of the whistle of the locomotive, because there was no evidence that the whistling of this or other locomotives had theretofore scared horses on the bridge so as to impose upon the city the duty to suppress it, while the evidence was plenary that the blowing of the city's fire whistle had terrified horses in this way.

The general duties were imposed upon the city to exercise ordinary care to keep the roadway of this bridge reasonably safe for travel, and to so use its waterworks building and the whistle thereon as to inflict no unnecessary injury upon the rights or property of persons or corporations. These duties were not limited to care to prevent injuries arising from acts and omissions within the limits of the highway

or bridge itself. The duty to care for the bridge and driveway extends to the prevention of any act outside its limits, the danger from which to travelers thereon may be reasonably anticipated by the city, such as unfenced excavations or depressions near but not in the highway or street (City Council of Augusta v. Dozier, 126 Ga. 524, 55 S. E. 234; Bassett v. St. Joseph, 53 Mo. 290, 14 Am. Rep. 446; Halpin v. City of Kansas, 76 Mo. 335; Parker v. City of Macon, 39 Ga. 729, 99 Am. Dec. 486), walls, billboards, and other structures on private property beyond the limits of a street (Kiley v. City of Kansas, 69 Mo. 102, 108, 33 Am. Rep. 491; Id., 87 Mo. 103, 56 Am. Rep. 443; Duffy v. City of Dubuque, 63 Iowa, 171, 18 N. W. 900, 50 Am. Rep. 743; Bliven v. City of Sioux City, 85 Iowa, 346, 351, 52 N. W. 246; Cason v. City of Ottumwa, 102 Iowa, 99, 71 N. W. 192), an acrobat sliding on a wire above the street fastened to a building beyond its limits and to a pole (Wheeler v. City of Fort Dodge, 131 Iowa, 566, 108 N. W. 1057, 1059, 9 L. R. A. [N. S.] 146). And the duty of the city to so use its own property as not to unnecessarily injure persons or property of others extends to their protection against injuries from such use on their own property or on the property of others, such as from sewage leaking into the property of citizens (Allen v. City of Boston, 159 Mass. 324, 327, 34 N. E. 519, 38 Am. St. Rep. 423; Hunt v. Lowell Gas Light Co., 8 Allen [Mass.] 169, 85 Am. Dec. 697; French v. Connecticut River Lumber Co., 145 Mass. 261, 14 N. E. 113), from a pesthouse which sends the seeds of disease to persons on private property near (Clayton v. City of Henderson, 103 Ky. 228, 44 S. W. 667, 44 L. R. A. 474, 476; Haag v. Vanderburgh County Com'rs, 60 Ind. 511, 28 Am. Rep. 654), from garbage on a lot belonging to the city which sends forth upon the property of others bad odors (City of Ft. Worth v. Crawford, 74 Tex. 404, 12 S. W. 52, 54, 15 Am. St. Rep. 840), from fireworks in a street which set fire to private property adjoining (Speir v. City of Brooklyn, 139 N. Y. 6, 34 N. E. 727, 21 L. R. A. 641, 36 Am. St. Rep. 664; Landau v. City of New York, 180 N. Y. 48, 72 N. E. 631, 105 Am. St. Rep. 709).

Persons and private corporations that negligently injure persons rightfully traveling upon a street or highway by blasting rock on their own premises, thereby throwing stones upon the highway, or by negligently frightening their horses by blowing whistles upon their own property, do not escape liability for the damages they thus cause (Albee v. Shoe Company, 62 Hun, 223, 16 N. Y. Supp. 687; Knight v. Goodyear, etc., Rubber Co., 38 Conn. 438, 9 Am. Rep. 406; Powell v. Nevada C. & O. Ry., 28 Nev. 305, 82 Pac. 96), although it is not their special duty to care for the safety of streets and highways, and a fortiori a city upon which the law imposes that particular duty may not escape liability for the injuries it causes in that way.

Nor is the damage which may be recovered for negligence of this character limited to that inflicted upon property. Damages for injuries to the person are likewise recoverable, because the duty imposed on the municipality to avoid unnecessary injury to persons is at least as imperative and sacred as the duty to avoid injury to their property.

Allen v. City of Boston, 159 Mass. 324, 337, 34 N. E. 519, 38 Am. St. Rep. 423; Clayton v. City of Henderson, 103 Ky. 228, 44 S. W. 667, 44 L. R. A. 474, 476; City of Ft. Worth v. Crawford, 74 Tex. 414, 12 S. W. 52, 54, 15 Am. St. Rep. 840.

The statutes of Minnesota provide that:

"A public nuisance is a crime against the order and economy of the state and consists in unlawfully doing an act, or omitting to perform a duty, which act or omission * * * shall unlawfully interfere with, obstruct, or tend to obstruct, or render dangerous for passage a * * * street, alley or highway." Rev. Laws Minn. 1905, §§ 4987, 4988.

And the Supreme Court of Minnesota has adjudged that:

"Where the statute, for the protection and benefit of individuals prohibits a person from doing an act or imposes upon him a duty, if he disobeys the prohibition or neglects to perform the duty, he is liable to those for whose protection the statute was enacted for any damages resulting proximately from such disobedience and neglect." Baxter v. Coughlin, 70 Minn. 1, 4, 72 N. W. 797, 798.

The duty was imposed upon the city to exercise care to render this highway reasonably safe for travelers, and it blew a whistle within 110 feet of it which made it unsafe for travelers, and which constituted a public nuisance within the express terms and plain meaning of this statute.

But counsel contend that the city is not liable to pay damages for the injuries inflicted by the whistle, because, in locating it and blowing it, it was exercising one of its governmental powers in the establishment and maintenance of its fire department and fire-alarm system, and this upon the ground that for the acts and omissions of its officers and agents in the exercise of a governmental power of this nature it is, like the state, exempt from civil liability. There is more than one answer to this argument. In the first place, if the blast of the whistle which caused the injuries had been made in the exercise of the city's power to protect against fires, it would not have been exempt from liability, because the blowing of the whistle was a public nuisance, and it was not necessary for the city to create or to continue that nuisance in order to rightly exercise its power to establish and maintain a fire department. It could have exercised that power as completely and as beneficially without locating or blowing this whistle daily within 110 feet of this bridge. If the exercise of a legislative power does not necessarily and naturally create a nuisance, but that results from the manner of exercising the power, the legislative grant is no defense to an action for the damages it causes. Village of Pine City v. Munch, 42 Minn. 342, 44 N. W. 197, 6 L. R. A. 763, Hill v. Mayor, 139 N. Y. 495, 34 N. E. 1090.

A city has two classes of powers, the one legislative, public, in the exercise of which it acts as a political subdivision and delegate of the state and governs its people, the other private, corporate, business, in the exercise of which it acts for the advantage of the inhabitants of the city and of itself as a legal personality. For the acts and omissions of its officers and agents in the exercise of powers of the former class, such as the police power (Wilcox v. City of Rochester, 190 N. Y. 137, 82 N. E. 1119, 17 L. R. A. [N. S.] 741; City of Kansas City

v. Lemen, 57 Fed. 905, 6 C. C. A. 627, 631; Claussen v. City of Luverne, 103 Minn. 491, 115 N. W. 643, 15 L. R. A. [N. S.] 698; Gullikson v. McDonald, 62 Minn. 278, 279, 280, 64 N. W. 812; City of New Kiowa v. Craven, 46 Kan. 114, 26 Pac. 426), the power to erect, maintain, and operate a city hall and courthouse (Snider v. City of St. Paul, 51 Minn. 466, 473, 53 N. W. 763, 18 L. R. A. 151), the power through its board of health or other agency to protect its inhabitants against disease and unsanitary conditions, and to care for the sick (Bryant v. St. Paul, 33 Minn. 289, 23 N. W. 220, 53 Am. St. Rep. 31; Maxmilian v. Mayor, 62 N. Y. 160, 20 Am. Rep. 468; Ogg v. City of Lansing, 35 Iowa, 495, 14 Am. Rep. 499; Benton v. Trustees of Boston City Hospital, 140 Mass. 13, 1 N. E. 836, 54 Am. Rep. 436; Barbour v. City of Ellsworth, 67 Me. 294), the power to maintain and operate a fire department to protect its inhabitants against conflagrations (Grube v. City of St. Paul, 34 Minn. 402, 26 N. W. 228; Miller v. City of Minneapolis, 75 Minn. 131, 77 N. W. 788; Smith v. City of Rochester, 76 N. Y. 506; Mayor v. Workman, 67 Fed. 347, 14 C. C. A. 530; Fisher v. City of Boston, 104 Mass. 87, 6 Am. Rep. 196), the power to promote education (Ham v. Mayor, 70 N. Y. 459; Lane v. District Township of Woodbury, 58 Iowa, 462, 12 N. W. 478), the power to inspect steam boilers (Mead v. City of New Haven, 40 Conn. 72, 16 Am. Rep. 14), and the power to administer public charities (Haight v. Mayor [D. C.] 24 Fed. 93), the city, like the state, is not liable to pay damages in civil actions.

But for damages caused by the wrongful acts and omissions of its officers and agents within the scope of their authority in the exercise of its powers of the latter class, such as its power to build and maintain bridges, streets, and highways, the power to construct and keep in repair sewers (Murphy v. City of Indianapolis, 158 Ind. 338, 63 N. E. 469; Williams v. Town of Greenville, 130 N. C. 93, 40 S. E. 977, 57 L. R. A. 207, 89 Am. St. Rep. 860; Hamlin v. City of Biddeford, 95 Me. 308, 49 Atl. 1100; City of Denver v. Rhodes, 9 Colo. 554, 13 Pac. 729), the power to collect refuse and to care for the dump where it is deposited (City of Denver v. Porter, 126 Fed. 288, 294, 61 C. C. A. 168), the power to construct and operate the draws of bridges (Naumburg v. City of Milwaukee. 146 Fed. 641, 77 C. C. A. 67), and the power to build, maintain, and operate waterworks to furnish water to the city and to its inhabitants for compensation (Wiltse v. City of Red Wing, 99 Minn. 255, 260, 109 N. W. 114; Lynch v. City of Springfield, 174 Mass. 430, 54 N. E. 871), the city is liable to the same extent as a private individual or corporation under like circumstances. The power of a city to construct and operate waterworks is not a political or governmental, but a private or corporate, power, granted and exercised, not to enable it to control its people, but to authorize it to furnish to itself and to its inhabitants water for their private advantage. Illinois Trust & Savings Bank v. City of Arkansas City, 22 C. C. A. 171, 182, 76 Fed. 271, 282, 34 L. R. A. 518; Pike's Peak Power Co. v. City of Colorado Springs, 44 C. C. A. 333, 342, 105 Fed. 1, 10; Omaha Water Co. v. City of Omaha, 77 C. C. A. 267, 271, 147 Fed. 1, 5, 12 L. R. A. (N. S.) 736.

The blast of the whistle which frightened Nichols' horses was not blown by the city in the exercise of its power to protect its inhabitants against fire and to operate its fire-alarm system or its fire department. It had no connection with or tendency to perform any of these functions. The blasts for those purposes were blown automatically through the fire-alarm system. This blast was blown by hand by the assistant engineer of the waterworks building by direction of the water commissioner and the city council in the exercise of the power of the city to maintain waterworks and care for the pumping station which was a part of them. It, therefore, falls far within the line of municipal liability.

The argument that the discretion of the city in the construction, location, and operation of its fire-alarm system is not reviewable by the courts has not escaped attention. But if sound it is not material, and hence will not be discussed, because it was not the exercise of that discretion, but the blowing of the whistle by the assistant engineer of the waterworks building, that was the proximate cause of the injuries and death and that is the foundation of these actions. The location and use of the whistle for the fire department, dangerous as it was, would never have caused the death of Nichols and the injury to Irene if the assistant engineer of the waterworks building had not pulled open the valve and sent forth the blast at 5 in the afternoon of that fatal day.

Finally, it is said that the city is not liable because it had no corporate power to cause this whistle to be blown for the purpose of notifying union men and the employés of the city of the time of day. But it had plenary power to erect, maintain, and operate the waterworks building. It had the power and it was its duty to so use that building and the whistle upon it that it would not inflict any unnecessary injury upon travelers upon the bridge, to prevent and, when it arose, to suppress, the public nuisance of the startling, dangerous 5 o'clock blasts of this whistle upon it, and to exercise ordinary care to keep the bridge reasonably safe for travelers thereon. For damages caused to travelers by the failure to discharge these duties it was liable in these cases, and the evidence of such a failure was so substantial that the refusal of the court below to direct a verdict in its favor was not error.

In the Botzet Case attention is called to the facts that while the whistle was blown, and the horses were frightened and started to run in the state of Minnesota, Irene was not thrown over the railing of the bridge and was not injured until they had carried her into the state of Wisconsin; that there is a statute of the latter state which limits the amount of recovery from any city, county, town, or village, on account of any defects in a bridge or highway, to $5,000, and that the verdict and judgment in that case were far in excess of this amount, and in excess of the amount specified in the notice of the claim upon which the action is based which was originally given to the city. But this action was brought in the state of Minnesota, the city committed the wrong on which it is founded in that state, the statute of Wisconsin had no effect beyond the limits of the state of Wiscon-

sin, and the plaintiff was not limited in his recovery to the amount claimed in his original notice. Terryll v. City of Faribault, 84 Minn. 341, 342, 87 N. W. 917.

There was no error in the trial of these cases, and the judgments below must be affirmed.

It is so ordered.