THE BOARD OF EDUCATION OF THE STATE OF ILLINOIS

*v.*

JULIA A. BAKEWELL.

*Filed at Springfield January 24, 1887.*

122  339
149  605

122  339
182  162
182  166

122  339
207  ⁵359
j207  ³368
j207  ³369

1.  NORMAL UNIVERSITY—*whether a State institution or a private corporation.*  The Normal University located at Normal, in this State, is not a public State institution, but is a private eleemosynary corporation, and it can not be deprived of its property by mere legislative enactment intended to transfer the same to another without due process of law.

2.  ESTOPPEL—*of private corporation to assert its real character in that regard.*  Where the charter of a private corporation contemplates its establishment and maintenance by charitable donations, the acceptance of appropriations by it from the State, even though made by the State under the belief that such corporation is a State institution, will not operate to estop it from asserting its rights of property as a private corporation.

3.  CONSTITUTIONAL LAW—"*due process of law"—power to legislate the property of one into the hands of another.*  The phrase, "due process of law," in the constitutional clause that "no person shall be deprived of life, liberty or property without due process of law," means, in due course of legal proceedings according to those rules and forms which have been established for the protection of private rights.  An arbitrary act of the legislature taking one person's property and giving it to another, is not "due process of law."

4.  SAME—*exercise of judicial powers by the legislature.*  To ascertain whether a deed is conditional, and whether there has been a breach of the condition, and to enforce forfeiture for the breach if found to have occurred, call for the exercise of judicial functions which it is not within the competency of legislative power to exercise.

5.  CORPORATION—*franchise, how lost.*  A private corporation created by the legislature may lose its franchises by a *mis-user* or a *non-user* of them, and they may be resumed by the government under a judicial judgment upon a *quo warranto* to ascertain if there be grounds for a forfeiture, but not by mere legislative enactment.

6.  The franchises and property of a private corporation not organized for pecuniary profit, will not be held to have been lost or surrendered to the State through expressions of mistaken legal opinion by its officials, or by the acceptance of legislative donations to such corporation.

7.  TRUST—*private charitable corporation.*  A private charitable corporation formed for the purpose of receiving donations for the establishment and maintenance of a normal university, and the education of teachers

for the common schools, will be a trustee of the property acquired by it, to
be held and administered for the special purpose of the charter.  In such
case the donors of its property, as well as those to be educated, will have
an interest in the faithful execution of the trust, and the courts will not
allow an abuse of the trust or the diversion of the trust property to other
purposes than those to which it has been devoted.

APPEAL from the Circuit Court of McLean county; the Hon.
N. J. PILLSBURY, Judge, presiding.

Mr. JAMES S. EWING, for the appellant.

Mr. H. SPENCER, Mr. R. E. WILLIAMS, and Mr. A. G. KARR,
for the appellee.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

On February 18, 1857, the General Assembly of this State
passed "An act for the establishment and maintenance of a
normal university," whereby certain named persons and their
successors were created a body corporate and politic, to be
styled "The Board of Education of the State of Illinois." (Laws
of 1857, p. 298.)   The 5th section of the act provided for the
appointment of an agent who should visit the cities, villages
and other places in the State which might be deemed eligible
for the purpose, to receive donations and proposals for the es-
tablishment and maintenance of the normal university, and
gave power to the board to fix the permanent location of such
university at the place where the most favorable inducements
were offered for that purpose.   On February 25, 1858, Edwin
W. Bakewell, and Julia A. Bakewell, his wife, who joined in
the deed for the purpose of relinquishing her inchoate right of
dower, conveyed to the Board of Education of the State of Illi-
nois forty acres of land immediately adjoining the university
grounds.   The only condition contained in the deed was the
following:  "Provided the Normal University, under the con-
trol of the said Board of Education of the State of Illinois,
shall forever remain where now located."   On February 9,

1860, the said Edwin W. Bakewell and his wife united in another deed to the said Board of Education of the State of Illinois, which, after reciting the execution of the former deed, and the condition therein, contained the following:

"And whereas, the said Edwin W. Bakewell, and Julia A. Bakewell, his wife, are willing and anxious to vacate and annul said condition to said deed, and to make the title of the said Board of Education of the State of Illinois to the said land conveyed by said deed, become and be absolute in fee simple; now, therefore, this indenture, made and entered into this 9th day of February, 1860, by and between the said Edwin W. Bakewell, and Julia A. Bakewell, his wife, and the said Board of Education of the State of Illinois, witnesseth, that they convey a full and complete and unconditional title, in fee simple, in and to the said forty acres."

The university still remains established where it was at the time of the making of the first deed.

The General Assembly, by a joint resolution passed in 1883, by a majority of a quorum only, directed that the State Board of Education execute a conveyance in fee simple of the said forty acres of land to Julia A. Bakewell. This joint resolution recites, in its preamble, that the land was deeded, in 1858, upon certain conditions to be fulfilled by the board of education, and that said conveyance was conditional, dependent for its validity upon the performance of said conditions, and that the conditions had not been complied with. The board of education refused to comply with the direction, and at its session in 1885, the General Assembly, again by a joint resolution passed by a majority of a quorum, declared that the title to said forty acres of land should be and was thereby declared vested in Julia A. Bakewell. A demand for the possession of the property was made upon the board, and refused. Thereupon, Julia A. Bakewell filed a petition in the circuit court of McLean county for a writ of *mandamus* commanding the Board of Education of the State of Illinois to execute a deed to her

for the said forty acres of land. The cause was tried by the court without a jury, and a peremptory writ of *mandamus* was awarded. The defendant appealed.

Two questions are made upon this record: Whether the legislature had the constitutional power to order the conveyance of this forty acres of land to be made to Julia A. Bakewell; and if so, whether it could exercise such power by a joint resolution.

As to the character of the Board of Education of the State of Illinois, in the respect of its being a public or a private corporation, this ground was most fully gone over by this court in the case of this same *Board of Education* v. *Greenebaum & Sons,* 39 Ill. 610, and the character of the corporation declared, and we need in this regard but to refer to that decision. That was a proceeding brought against this board of education to enforce a mechanic's lien for work and labor done upon the university building. The contract was made in 1860, and the decision rendered in 1864. It was said in the opinion: "The principal objection to the recovery in this case, and the one most pressed, is, that the board of education is a corporation founded by the State, and supported by the funds of the State, and that its property is the property of the State, and therefore not subject to a mechanic's lien. To determine the force of this objection, the act of 1857 must be considered, and the additional act of 1861." The latter act was one entitled "An act to refund the interest on the college or university fund, and appropriate the same for the use of the State Normal University." After recapitulating in detail all the several provisions of these two acts, it was further said:

"From this legislation the plaintiffs in error insist that the property of the Normal University is the property of the State, in which the corporation have no interest whatever; that it was erected for certain public purposes in which the whole State has an interest, and certain rights secured to each county in the State. * * * The counsel also insists that the legislature have the absolute right to repeal or modify the charter,

and that, from the act of 1861, it is manifest it was not the intention of the legislature that the property held in the name of the board should be sequestered and sold by creditors or others,—that the corporation is a mere trustee or agent of the State, to carry out the wishes and intention of the legislature," etc. And after stating that the court's view of this legislation differed materially from that of plaintiff's in error, and that it had not been able to find in either of these acts any provisions on which to base such a view as that of plaintiff's in error, or any power reserved to the legislature to repeal or modify the charter, the opinion proceeds :

"We regard this university as an eleemosynary institution, founded for the purpose of the gratuitous distribution of knowl-edge of the art of teaching and conducting common schools, and erected, not at the expense of the State, but of individuals. An agent was to be appointed by the corporation to visit the different cities, villages and other places in the State deemed eligible for the purpose, to receive donations and proposals for the establishment and maintenance of the university, and its permanent location was to be fixed at the place where the most favorable inducements were offered for that purpose. The salaries of the instructors and other employes are fixed by the board, and no appropriation has ever been made from the State treasury for its maintenance. This is one feature which distinguishes it from our State institutions, properly so called, such as the asylum for the blind, etc. It is true the State applied the interest of the university and seminary fund to aid in maintaining this university, but that interest did not belong to the State. The State held it as a mere trustee, under the compact with the general government, and it was specially devoted by that compact to a college or university. The act of 1857 expressly provides that no part of this fund should be applied to the purchase of sites or for buildings for this university. * * * This building, with the ground upon which it was erected, was a free gift by charitable in-

dividuals to the corporation, not to the State, and there can not, therefore, exist any obligation on the part of the State to defray any of the expenses attending its erection. Its whole history shows it to be the result of private munificence."

As said by Blackstone, corporations of the eleemosynary sort are such as are constituted for the distribution of the free alms or bounty of the founder of them to such persons as he has directed,—of which kind are all hospitals for the maintenance of the poor, sick and impotent, and all colleges. 1 Blackstone's Com. 471.

Mr. Justice STORY, in his opinion in the case of *Dartmouth College* v. *Woodward*, 4 Wheat. 669, says: "Another division of corporations is into public and private. Public corporations are generally esteemed such as exist for public political purposes only, such as towns, cities, parishes and counties, and in many respects they are so, although they involve some private interests; but strictly speaking, public corporations are such only as are founded by the government for public purposes, where the whole interests belong also to the government. If, therefore, the foundation be private, though under the charter of the government, the corporation is private, however extensive the uses may be to which it is devoted, either by the bounty of the founder or the nature and objects of the institution.   *   *   *   This reasoning applies in its full force to eleemosynary corporations. A hospital founded by a private benefactor is, in point of law, a private corporation, although dedicated by its charter to general charity. So a college," etc. It is only a public corporation, and not a private eleemosynary corporation, as appellant has been adjudged by this court to be, which is liable to the control of the legislature.

It is conceded by appellee's counsel, as it must be, that originally appellant was a private corporation, but it is said that *after* the decision in the *Greenebaum case*, by the acts of the Board of Education and the legislature of the State, the character of the institution became changed from that of a

private corporation to a State institution and a public corporation, under the paramount control of the legislature. The acts of the Board of Education which are relied on in this regard, are three exhibits, "A," "B" and "C," to the petition, and the acceptance by the board of appropriations made to it by the legislature. It is said that by these exhibits appellant offered to make surrender of its corporate franchises, and urged the State, through and by the legislature, to accept such surrender, which the legislature did accept.

The second section of the act of 1857, for the establishment and maintenance of the university, provides that "the Superintendent of Public Instruction, by virtue of his office, shall be a member and secretary of said board, and shall report to the legislature, at its regular sessions, the condition and expenditures of the Normal University, and communicate such further information as the said Board of Education or the legislature may direct."

These exhibits are three reports, made, as stated therein, in pursuance of such requirement, through the secretary of the board, dated, respectively, December 20, 1860, December 17, 1862, and December 14, 1864, and signed, the first by thirteen, the second by ten and the last by seven, of the fifteen members of the board. They make report of the condition and expenditures of the university, contain solicitations of aid from the legislature, and set forth reasons and arguments in support of such solicitations. For example, in the second report is the following :

"The act for the establishment and maintenance of a normal university was passed February 18, 1857. By the various provisions of that act, as also by the provisions of the subsequent act of the legislature passed February 14, 1861, entitled 'An act to refund the interest on the college and university fund, and to appropriate the same for the use of the State Normal University,' the Normal University is made a State institution. It is under the sovereign control of the leg-

islature, and the corporation are the trustees and agents of the State, with only such powers as have been conferred by the legislature, and these powers constantly liable to be modified or limited, as was done by the act last mentioned. The corporation have no personal or pecuniary interest in the trust or property, and the corporation may properly be classed among the public eleemosynary corporations of the State." "The State, by the act of February, 1861, have assumed entire control over all the property acquired by the board, and have forbidden the sale or incumbrance of the property. The State has assumed, and properly, too, complete jurisdiction over the entire institution and property." "There is already a decree for a mechanics' lien in the McLean circuit court, in favor of Greenbaum & Sons, for nearly $9000, and they threaten to sell, by virtue of said decree, the property of the board, which is the property of the State. The board possesses no means to prevent judgments and decrees from being had against us, nor a sale of the property, if the property of the State can be sold by virtue of a decree or execution, of which the board entertain great doubt." "The corporators have no interest in this property. It is the property of the State, as much as is the capitol at Springfield." "The legislature has seen proper to deprive us of the right to sell or dispose of any property belonging to the State, for any purpose whatever; therefore, the maintenance and destiny of the institution are entirely in the hands of the legislature." And earnest appeals are made to the legislature for financial aid.

This is the purport of all that these reports contain as affording evidence of a surrender of corporate franchises. What is said in them touching the character of the corporation, and the ownership of its property, is but an expression of the opinion of members of the board upon the legal effect of the acts of 1857 and 1861, and which is at variance with the decision of the Supreme Court. Surely this expression of legal opinion by the Superintendent of Public Instruction, and

others signing these papers with him, that the corporation was a public eleemosynary corporation, and that its property was the property of the State, did not make them such. These documents, so far from evidencing any surrender of corporate franchises, show the exact reverse. They look to the continuance of the exercise of such franchises, and ask for means to enable the board, with the more efficiency, to carry out the objects for which the corporation was created. To make of these reports anything of the character of a surrender, or offer of surrender, of appellant's corporate franchises, is to distort them into something which they palpably are not.

On February 28, 1867, the General Assembly passed an act entitled "An act concerning the board of education, and the Illinois Natural History Society," sections 1 and 2 of which are as follows:

"Sec. 1. The State Normal University, established by an act approved February 18, 1857, is hereby declared a State institution, and the property, real, personal and mixed, in the hands and standing in the name of the Board of Education of the State of Illinois, is the property of the State of Illinois, and is by said board held in trust for the State.

"Sec. 2. Said board of education is hereby authorized to sell and dispose of the out-lands and lots standing in the name of said board, lying in the counties of Jackson, Woodford and McLean, except the site of the Normal University, and the farm of one hundred acres, more or less, in its immediate vicinity, and to appropriate the proceeds thereof towards the payment of the appropriations hereinafter named."

The residue of the act but makes some small appropriations to the univetsity. (Laws of 1867, p. 21.) By the act of 1861 the board was prohibited from selling or incumbering its property.

This act of 1867 is relied on by appellee's counsel as an acceptance of the surrender of the corporate franchises of appellant, supposed to have been made by the aforenamed reports.

The act is as deficient in showing an acceptance of such a surrender, as are the documents named in showing a surrender. There is no intimation whatever in the act, of such surrender or acceptance. The act is a simple seizing of the property of the corporation into the hands of the State. In the way of this is the constitutional provision that "no person shall be deprived of life, liberty or property without due process of law." As said in *Westervelt* v. *Gregg,* 2 Kern. 209: "Due process of law undoubtedly means, in the due course of legal proceedings according to those rules and forms which have been established for the protection of private rights. Such an act as the legislature may, in the uncontrolled exercise of its power, think fit to pass, is in no sense the process of law designated by the constitution."

It is a provision of the constitution of 1870, that "the State shall never pay, assume or become responsible for the debts or liabilities of, or in any manner give, loan or extend its credit to or in aid of, any public or other corporation, association or individual." (Sec. 20, art. 4.) It is said that since the constitution of 1870 went into effect, there has been appropriated $278,186 for and on account of the Normal University, out of the State treasury, exclusive of the moneys arising from the "Seminary fund;" "and having accepted these appropriations, the board of education is estopped, by its own acts, to say that it is a private corporation, and that the Normal University, and the property standing in the name of the board, is the property of a private corporation, and is estopped to question the validity of the act of 1867, declaring this property to be the property of the State." The making of these appropriations might be evidence that the legislature, at the time, considered appellant to be a State institution, and that the act of 1867, taking away from it its property and vesting it in the State, was a valid enactment,—and this we conceive is all the significance there is in respect of these appropriations. What appellant indeed was, in the respect of being a

State institution or a private corporation, depended upon what the charter of its creation made it to be, and not what the legislature may have, at some time afterward, considered it to be. And so as to the validity of the act of 1867, the legislative opinion in that regard would not govern, but the constitutional power to pass the law. Appellant's act of incorporation contemplated that the university was to be established and maintained by charitable donations, and we do not see why it might not well accept these appropriations made to it, and yet stand upon all its chartered rights,—why, from such acceptance, appellant should be held to be narrowed down to that view of its rights which the legislature may be supposed to have entertained when making the appropriations. The appropriations were made as a free gift, untrammeled with any condition, and we can not think that from their acceptance there was the yielding of any right. We perceive no element of estoppel in the matter.

It is said the action of the legislature in the passage of the law of 1867 was not questioned by the board; that, on the contrary, it received the public funds appropriated by that act and since, and must be treated, as between itself and the State, as consenting to the said enactment, even if its consent did not expressly appear. There was never occasion to question such action of the legislature until the time of the present suit. The declaration of the act of 1867, that the State Normal University was a State institution, and that the property of appellant was the property of the State of Illinois, stood a mere harmless declaration upon the statute book, having no effect. But so soon as there was the first attempt to put the declaration in force, by bringing this suit, resistance was made. From the first, appellant was a constant suppliant before the legislature for pecuniary aid, and there were appropriations made to it from the State treasury, as well before as after the act of 1867. Appellant should not have the title to $200,000 of property,—the amount its reports showed it to

possess,—taken away from it upon such a ground as thus suggested.

We have thus adverted to what is insisted upon, as showing that *after* the decision in the *Greenebaum case*, by the joint action of the board of education and the legislature, appellant did become a public corporation, and the Normal University a State institution. We do not find that since that decision there has been any change effected in the character of this corporation. As it was then adjudged to be a private elee-mosynary corporation, we find that it still remains such. It is true that at the time of that decision it was found that no appropriation had been made to the university from the State treasury, and that since then there have been made such appropriations. But this we consider an unimportant circumstance. The foundation of the university, which was the first gift of the revenues, was private, and this, with the charter, fixes the character of the corporation as private, notwithstanding there may have been subsequent appropriations to it from the State treasury.

The joint resolution directing the conveyance of this land to Julia A. Bakewell, puts forth in its justification that the conveyance by E. W. Bakewell and wife to the board of education was a conditional conveyance, and that the conditions upon which its validity depended had never been complied with. To ascertain that a deed is conditional, that there has been a breach of condition, and to enforce forfeiture for the breach, are judicial functions, which it is not within the competency of legislative power to exercise. This $200,000 of property, the donations of private donors, was owned by this private corporation of the Board of Education of the State of Illinois by an indefeasible title, of which it could not be divested without the default or consent of the corporators. A private corporation, created by the legislature, may lose its franchises by a *mis-user* or a *non-user* of them, and they may be resumed by the government under a judicial judgment upon a *quo warranto*

to ascertain and enforce a forfeiture.   (*Terrett et al.* v. *Taylor et al.* 9 Cranch, 51.)   But we can not recognize that they may be lost, here, by expressions of mistaken legal opinion by members of the board, or by the acceptance of legislative donations made to the corporation.   In respect of consent, there is no claim of anything more than an implied consent, by appellant to the deprivation of its property, arising from the reports made, which have been alluded to, and the accepting of appropriations to it from the State treasury.

But there can be no pretence of anything of assent to misappropriation of the property.   In this respect the board has been strictly faithful to its trust.   In their second report above named they say: "And it is the duty of the legislature to see and to know that the great object of the creation of the university is accomplished; that the trustees of the institution faithfully discharge all the duties imposed upon them; that the property of the institution, which is the property of the State, is carefully preserved, not misappropriated or permitted to be sequestered by judgments, nor upon any pretence whatever."

It would seem to be supposed, here, that the corporation and the legislature together had the right of absolute disposition of this corporate property.   But there are other rights and interests than of these bodies here involved.   Appellant is but a trustee of this property, to hold and administer it for the special purpose named in its charter,—the education of teachers for the common schools.   The benefactions were devoted by the donors to this special purpose, and can be applied to no other.   Appellant stands here as representing the donors, and their rights are to be defended and maintained by it.   And so with respect to those who are to derive learning from this source, appellant is a trustee for them also.   Religion, charity and education are, in the law, legatees or donees, capable of receiving bequests or donations in this form.   (*Dartmouth College* v. *Woodward,* 4 Wheat. 643.)   Before the courts, it will not be suffered that

there shall be any abuse of the trust, and it will be seen to that the property shall not be diverted from the object to which it was devoted by the donors.    To take this property in question from the Board of Education of the State of Illinois, and give it away to Julia A. Bakewell, would be a clear perversion of the trust upon which the property is held.    For the accomplishment of this purpose the writ of *mandamus* is sought, and it should have been denied.

It becomes unnecessary to consider the other question, whether, had the power of the legislature to order the conveyance existed, it was exercised in a legal mode.

The judgment will be reversed, and the cause remanded.

*Judgment reversed.*

SCOTT, SCHOLFIELD and SHOPE, JJ., dissenting.