MARY W. NILES, EXECUTRIX, ESTATE OF ALFRED S. NILES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33415.   Promulgated September 24, 1930.

*H. W. Schultheis, Esq.*, and *Emory H. Niles, Esq.*, for the petitioner.

*J. E. Marshall, Esq.*, and *C. A. Ray, Esq.*, for the respondent.

950

## OPINION.

MURDOCK: The Revenue Acts of 1924 and 1926 provide in section 213(a) that the term "gross income" includes income derived from salaries, wages or compensation for personal service of whatever kind and in whatever form paid. Prior revenue acts contain a similar provision in almost identical language. However, there was a provision in each of the income-tax acts prior to the 1918 Act which excluded from tax "the compensation of all officers and employees of a State or any political subdivision thereof except when such compensation is paid by the United States Government." But, beginning with the Revenue Act of 1918, this latter provision has been omitted from subsequent revenue acts, and, except for section 1211 of the Revenue Act of 1926, no specific provision has been made in these later acts excluding from taxation the compensation of officers and employees of a State or political subdivision thereof.

In connection with the omission of such a provision from the Revenue Act of 1918, the Senate Finance Committee report stated:

The Committee amended section 213(a) so as to require that any gains, profits and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, and so on, be subject to income tax, leaving the constitutional question as to the authority of Congress to tax certain salaries to be settled by the courts in any case in which the question may be raised.

Section 1211 of the Revenue Act of 1926 is as follows:

Any taxes imposed by the Revenue Act of 1924 or prior revenue Acts upon any individual in respect of amounts received by him as compensation for personal services as an officer or employee of any State or political subdivision thereof (except to the extent that such compensation is paid by the United States Government directly or indirectly), shall, subject to the statutory period of limitations properly applicable thereto, be abated, credited, or refunded.

I. T. 2357 referred to in the deficiency notice is in part as follows:

For 1925 and subsequent years compensation received by an individual for services rendered to a State, or political subdivision thereof, is included in gross income unless the person received such compensation as an officer or employee of a State, or political subdivision thereof, and the services were rendered in connection with the exercise of an essential governmental function. In accordance with the provisions of section 1211 of the Revenue Act of 1926, amounts received by an individual as compensation for personal services as an officer or employee of any State, or political subdivision thereof, in the year 1924 or prior years, are exempt from income tax, without regard to whether such services were rendered in connection with the exercise of an essential governmental function.

Although there was no express provision in the Act, the Commissioner, in his Regulations 69, relating to the Revenue Act of 1926, stated in article 88:

Compensation paid to its officers and employees of a State or political subdivision thereof for services rendered in connection with the exercise of an essential governmental function of the State or political subdivision * * * is not taxable.

The respondent contends that his determination should be approved, first, because the petitioner was not an officer or employee of the State of Maryland, and, second, because his services were not rendered in connection with the exercise of an essential governmental function as required by article 88 of Regulations 69 above quoted. Counsel for the petitioner referred to section 213(a)(7) of the Revenue Acts of 1924 and 1926, but this section has nothing to do with the salary of an individual such as we are here concerned with.

The courts have held that the Constitution of the United States, by necessary implication, although not by express provision, prohibits interference by Federal taxation with the means, agencies or instrumentalities by which the States exercise their sovereign power or discharge their strictly governmental functions. *Collector* v. *Day*, 78 U. S. 113; *State of South Carolina* v. *United States*, 199 U. S. 437; *Flint* v. *Stone Tracy Co.*, 220 U. S. 107. In *Collector* v. *Day*, *supra*, the court stated:

* * * And if the means and instrumentalities employed by that government [Federal] to carry into operation the powers granted to it are, necessarily, and, for the sake of self-preservation, exempt from taxation by the States, why are not those of the States depending upon their reserved powers, for like reasons, equally exempt from Federal taxation? Their unimpaired existence in the one case is as essential as in the other. It is admitted that there is no express provision in the Constitution that prohibits the general government from taxing the means and instrumentalities of the States, nor is there any prohibiting the States from taxing the means and instrumentalities of that government. In both cases the exemption rests upon necessary implication, and is upheld by the great law of self-preservation; as any government,

whose means employed in conducting its operations, if subject to the control of another and distinct government, can exist only at the mercy of that government.

Revenues of the United States must be obtained from the people of the States, and it is apparent that there is a conflict between the full power of the Nation to tax and the exemption of the State from Federal taxation in respect to its property and the discharge of its functions. Immunity from Federal interference by taxation does not, however, attach to every function which a State may discharge or to every activity in which a State may engage. *Veazie Bank* v. *Fenno*, 75 U. S. 533; *South Carolina* v. *United States, supra*: *State of North Dakota* v. *Olson*, 33 Fed. (2d) 848; *Blair* v. *Byers*, 35 Fed. (2d) 326; *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514. As stated in *Metcalf & Eddy* v. *Mitchell, supra*, " there is no formula by which the line may be plotted with precision in advance " to divide " those activities, having some relation to government, which are nevertheless subject to taxation, from those which are immune." Recourse must be had to the necessity upon which the rule rests. In deciding on which side of the line any particular case falls, it is helpful to study some of the leading opinions on the subject.

In *Veazie Bank* v. *Fenno, supra*, the court stated that the reserved rights of the States, such as the right to pass laws, to give effect to laws through executive action, to administer justice through the courts, and to employ all necessary agencies for legitimate purposes of State government, are not proper subjects of the taxing power of Congress; but that franchises granted by a State, when not conferred for the purpose of giving effect to some reserved power of a State, are not exempt. See also *Collector* v. *Day, supra*; *Flint* v. *Stone Tracy Co., supra*.

The following quotation is from *Ambrosini* v. *United States*, 187 U. S. 1, where the court was discussing this subject:

The question is whether the bonds were taken in the exercise of a function strictly belonging to the state and city in their ordinary governmental capacity * * *.

In *South Carolina* v. *United States, supra*, it was pointed out that the cases in which a Federal tax had been held invalid were those in which the tax was a charge upon the means and instrumentalities employed by the State in the discharge of its ordinary functions as a government, and that these decisions " indicate that the thought has been that the exemption of State agencies and instrumentalities from National taxation is limited to those which are of a strictly governmental character, and does not extend to those which are used by the State in the carrying on of an ordinary private business."

The opinion of the court in *Flint* v. *Stone Tracy Co.*, *supra*, was in part as follows:

The true distinction is between the attempted taxation of those operations of the States essential to the execution of its governmental functions, and which the State can only do itself, and those activities which are of a private character. * * *; the latter, although regulated by the State and exercising delegated authority, such as the right of eminent domain, are not removed from the field of legitimate Federal taxation.

In *State of North Dakota* v. *Olson*, *supra*, a distinction is drawn between public purpose and governmental function. See also *City of Winona* v. *Botzet*, 169 Fed. 321.

The following quotation is from *Metcalf & Eddy* v. *Mitchell*, *supra:*

Just what instrumentalities of either a state or the federal government are exempt from taxation by the other can not be stated in terms of universal application. But this Court has repeatedly held that those agencies through which either government immediately and directly exercises its sovereign powers, are immune from the taxing power of the other. Thus the employment of officers who are agents to administer its laws (*Collector* v. *Day*; *Dobbins* v. *Commissioners of Erie County*, *supra*), its obligations sold to raise public funds (*Weston* v. *The City Council of Charleston*, *supra*; *Pollock* v. *Farmers' Loan & Trust Co.*, *supra*), its investments of public funds in the securities of private corporations, for public purposes (*United States* v. *Railroad Co.*, *supra*), surety bonds exacted by it in the exercise of its police power (*Ambrosini* v. *United States*, *supra*), are all so intimately connected with the necessary functions of government, as to fall within the established exemption; and when the instrumentality is of that character, the immunity extends not only to the instrumentality itself but to income derived from it (*Pollock* v. *Farmers' Loan & Trust Co.*; *Gillespie* v. *Oklahoma*, *supra*), and forbids an occupation tax imposed on its use. *Choctaw & Gulf R. R. Co.* v. *Harrison*, *supra*; and see *Dobbins* v. *Commissioners of Erie County*, *supra*.

Turning now to the pertinent question of whether or not the services rendered by the decedent as professor of constitutional law in the law school of the University of Maryland were rendered in connection with the discharge of an essential governmental function, we find that a distinction has been drawn between what are known as the public schools—schools conducted by the State itself or by a political subdivision thereof such as a county, municipality, or school district—on the one side, and a college or university, even though given the name of the State, conducted by a separate private eleemosynary corporation on the other. For example, courts have held that, in conducting schools of the former kind, the State or political subdivision thereof is engaged in a governmental function and is not liable for tort or for breach of contract. *Lane* v. *District Township of Woodbury*, 58 Iowa, 422; 12 N. W. 478; *Gold* v. *Mayor and City Council of Baltimore*, 137 Md. 335; 112 Atl. 588; *Williams* v. *Fitzhugh*, 147 Md.

267; 93 Atl. 518. But the law school of the University of Maryland was not a school of this kind. It was a school of the latter class above mentioned to which a different rule applies. Cf. *Medical College of Georgia* v. *Rushing*, 1 Ga. App. 468; 57 S. E. 1083. It happens that the corporation known as the Regents of the University of Maryland was a party to a suit in the decision of which the court of last resort in Maryland gave its opinion on some questions which are important here. *Regents of the University of Maryland* v. *Williams*, 9 Gill & J. (Md.) 365. This case has been frequently cited by Maryland courts, the courts of other States and the Federal courts, including the Supreme Court of the United States.

A suit in assumpsit was brought by the regents against Williams for the recovery of money received by the latter as treasurer of certain persons claiming, under the Act of 1825, to be the trustees of the University of Maryland. The judgment below had been for the defendant. The Maryland Court of Appeals reversed this judgment. The opinion of the court recited that by the Act of 1812, chapter 159, the University of Maryland had been created, and that the members of the four faculties thus united with the provost of the university and their successors, were declared to be a corporation to continue forever by the name of the Regents of the University of Maryland. The court then held that this was a "private eleemosynary corporation, differing from a college only in degree." In this connection the court said:

A public corporation, is one that is created for political purposes, with political powers, to be exercised for purposes connected with the public good in the administration of civil government; an instrument of the government subject to the control of the legislature, and its members officers of the government, for the administration or discharge of public duties, as in the cases of cities, towns, &c.; * * *

The corporation of the University has none of the characteristics of a public corporation. It is not a municipal corporation. It was not created for political purposes, and is invested with no political powers. It is not an instrument of the government created for its own uses, nor are its members officers of the government, or subject to its control in the due management of its affairs, and none of its property or funds belong to the government. The state was not the founder, in the sense of that term as applied to corporations. It was the creator only, by means of the act of incorporation, and may be called the *incipient*, not the *perficient* founder. It gave to it in its creation the capacity to acquire and to hold property, but made to it no donation; and whatever property the corporation has, is its own, to be managed and disposed of by the Regents for the uses of the institution, in such manner as they may judge most promotive of its interests, and not for the uses of the government, nor in the exercise of any political powers, but as the trustee merely for the University. It is said there have been subsequent endowments by the state. If it be so, that can not affect the character of this corporation. If eleemosynary and private at first, no subsequent endowment of it by the state could change its character, and make it public. * * *

But it has been urged in argument at the bar, that whenever the *end* is public, the franchise granted to effect that *end* is also public. That here, the *end* was the preservation of life and health, which depend upon the skill of those who minister to the sick, &c. A public *end*, in which the whole public have an interest, and therefore that this corporation is public. * * *

It is not enough to say, that the public has an interest in the skill and learning of physicians and surgeons. The public has a deep interest in the dissemination of learning and useful knowledge; and so it has in the beneficial results to the community of insurance, canal, rail road, and turnpike companies, &c. The uses or objects may, in a certain sense, be called public; but the corporations as distinguished from the uses or objects, are private. * * *

The institution, the bank, canal, rail road, college, &c. from the nature of its particular object, and the interest the public has in that object may, and commonly does acquire, in a popular sense, the character of a public institution; but the corporation, the artificial being composed of natural persons for the management of the affairs of the institution, in contemplation of law is private; as much so as the individuals composing it were, before the act of incorporation imparted to them an artificial existence, with power to take and hold property in that particular form, and for particular purposes, which is all the act of incorporation does, and that only because the particular objects can best be effected in that particular form. But not therefore making the artificial being or corporation an instrument, nor the persons composing it members of the civil government of the country. * * *

Public corporations are to be governed according to the laws of the land, and the government has the sole right, as trustee of the public interest, to inspect, regulate, control, and direct the corporation, its funds and franchises. That is of the essence of a public corporation. But it has no such right in relation to eleemosynary corporations, or the management of their affairs. That belongs to the visiters alone, under the visitatorial power incident to such corporations.

The Regents of this University are made the visiters by the terms of the act of 1812, * * *. And all the authorities agree that colleges and academies established for the promotion of learning and piety, and endowed with property by public and private donations, are, in a legal sense, equally with hospitals for the relief of the poor, sick, &c. considered and treated as private eleemosynary·corporations.

The court then went on to hold that the act incorporating the Regents of the University of Maryland was a contract, the obligations of which were impaired by the Act of 1825, chapter 190, and that the latter act was therefore void, this act being an attempt to abolish the board of regents, to appoint a number of persons as trustees of the university, to invest them with the powers and privileges belonging to the corporation of the regents, and to connect that corporation with the political power of the State by declaring that the governor, for the time being, shall *ex officio* be the president of the board of trustees and shall fill up vacancies occuring in the board of trustees, all without the consent of the regents. In this connection the court stated:

The act of 1825 was a peremptory and unconditional dissolution of the corporation of the Regents; made by its terms, to take effect with or without its consent, and manifestly passed under the impression, that no consent was necessary.

See also *Board of Education* v. *Bakewell*, 122 Ill. 339; 10 N. E. 378.

In the case of *Inhabitants of Orono* v. *Sigma Alpha Epsilon Society*, 105 Maine, 214; 74 Atl. 19, the court mentioned many of the distinctions between the usual free public schools and the State university, and held that the University of Maine, while chartered by the State and fostered by it, is not a branch of the State's educational system, nor an agency nor an instrumentality of the State, but a corporation wholly separate and apart from the State, and not such a State institution as the public schools or the normal schools. In comparing the university with the normal schools, the court said in referring to the latter:

In this way the state itself took on a new form of public service, and the educational system thus adopted became in fact an instrumentality of the state. No corporation was created, no separate entity was brought into existence, but the state simply put its own beneficent hand in a new direction, and the title to the property was taken in the name of the state.

The court pointed out that no appropriation was made to the university for ten years after its incorporation, but that later donations were made and finally annual appropriations were made, which amounted in 1907 and 1908 to $110,000 for each year. But it held that such gifts could not change the character or legal status of the institution any more than smaller gifts to academies and private hospitals could make them a part of the sovereign State, and that the status of this institution was the same as that of other colleges chartered by the State, each doing excellent work along the lines of higher education, but not a component part of the State's educational system. The court then stated that the difference between the normal schools and the university was parallel to the difference between various so-called public or general hospitals in the State and the two hospitals for the insane, the two first mentioned hospitals doing a necessary and charitable work and being the recipients of the bounty of the State, but the last mentioned hospitals alone representing the State itself in its sovereign capacity. The court distinguished the case of *Auditor General* v. *Regents of the University of Michigan*, 83 Mich. 467; 47 N. W. 440, where the Michigan court based its decision upon the fact that by the Constitution of Michigan, the regents of the university were made an agency of the State.

The legislature of the State of Maryland also has recognized the difference between public schools of the State and such schools as the University of Maryland. The laws of the State provide that throughout the State there shall be a general system of free public

schools; educational matters affecting the State and the general care and supervision of public education shall be entrusted to a State department of education at the head of which shall be a State board of education; educational matters affecting a county shall be under the control of a county board of education; educational matters affecting a school district shall be under the care of a district board of school trustees; the governor shall appoint the members of the State board of education and the members of each county board of education, and the members of the district board of school trustees shall be appointed by the county board of education; the State superintendent of schools shall be appointed by the State board of education; the State board of education shall transmit biennially to the governor, an annual State public school budget including the appropriation for the State department of education, the maintenance of the State normal schools, etc., and shall transmit each year to the governor an annual report covering all operations of the State department of education; and necessary and suitable public schools shall be maintained throughout the State. The laws also provide that the elementary schools shall be kept open and free to all white youths between six and twenty years of age; all white youths between the ages of six and twenty-one shall be admitted into such public schools of the State, the studies of which they may be able to pursue, and text books shall be free. Provision for colored children also is made. Children more than six years old and not over a certain age are required to attend some school regularly. Children over sixteen are not required to attend schools. The establishment of high schools throughout the State is authorized and provision is made for State aid to such schools. All high schools are under the direct control of the several county boards of education. Baltimore City is specially provided for in the laws. The State board of education and the State superintendent of schools are made the board of trustees of each of the normal schools maintained and supported by the State. Students regularly admitted to the State normal schools from the city of Baltimore and the several counties, who obligate themselves to teach in the State of Maryland, have free tuition and are furnished the use of text books free of charge. Other students may be admitted to these schools in the discretion of the board of trustees, upon the payment of a fee. The treasurer of the State board of education makes an annual report to the governor of receipts and disbursements of each of the State normal schools.

Thus, it is seen that those residents of Maryland of the proper age desiring to attend a public school, even a high school or normal school, can do so without cost. These schools are supported either entirely by the State or by some subdivision thereof. Those persons

living within the limits of the State have a right to demand, under proper circumstances, that such school facilities be made available to them. The University of Maryland, and particularly the law school thereof, is not under the control and supervision of the State board of education or the State department of education. Residents of the State do not have any right to demand that the facilities of this law school be made available to them. A few students voluntarily attend the law school to equip themselves for a special profession. They pay tuition. The law school may be aided by the State, but as many private schools and institutions receive State aid, this has no significance. Cf. *Medical College of Georgia* v. *Rushing, supra.* Only the State or some political subdivision thereof exercising sovereign power can conduct schools of the character of the public schools. But the University of Maryland has long been a private eleemosynary corporation like many others, and in conducting the law school is not performing a definite governmental function peculiar to the sovereign character of the State. Cf. *Coronado Oil & Gas Co.,* 14 B. T. A. 1214.

The corporation known as the "University," mentioned in *Regents of the University of Maryland* v. *Williams, supra,* has never been dissolved. Alfred S. Niles was a professor in the law school of that university. Until 1920 the State of Maryland had no more control over this university than it had over any other university in the State, and in conducting the university, no governmental function essential or otherwise, was being discharged by the State or any arm or subdivision of the State. The Act of 1920, chapter 480, merging the Maryland State College of Agriculture and the University of Maryland, seems very much like the Act of 1825, chapter 190, which was held unconstitutional and void in *Regents of the University of Maryland* v. *Williams, supra.* Cf. *Board of Education* v. *Bakewell, supra.* But we need not decide whether the Act of 1920 is or is not constitutional. This act authorized the governor to appoint the regents of the University by and with the advice and consent of the senate. Yet, the State can not dissolve or destroy the corporation, and the legislature can not control it except indirectly by its voice in the appointment of regents. According to the testimony, the law school is still under the special supervision of its own faculty as permitted by the Act of 1920. This is not the control usually exercised by a State over a State institution. Cf. *Board of Education* v. *Bakewell, supra.*

Perhaps no one thing about the manner in which or the circumstances under which the law school of the University of Maryland was conducted during the years 1925 and 1926 discussed in the foregoing opinion is decisive of the question before us. But after giving due consideration to all, and without relying solely on any

one fact or circumstance, we are satisfied that during the years in question, in the conduct and direction of the law school of the University of Maryland, no governmental function of the State, essential or otherwise, was performed or discharged which by necessary implication is immune from such interference as Federal taxation of the salary of one of the professors in that law school. Niles was not an officer or employee of the State of Maryland, did not render services as such, and received no compensation for services rendered as such.

Reviewed by the Board.

*Judgment will be entered for the respondent.*

ARUNDELL concurs in the result.

MATTHEWS dissents.