MAIATICO CONST. CO., Inc., v. UNITED STATES, to Use of PHELPS et al. *

No. 6311.

United States Court of Appeals for the District of Columbia.

Argued April 1, 1935.

Decided July 29, 1935.

*Writ of certiorari denied 56 S. Ct. 309, 80 L. Ed. —.

the buildings. Article 16 of the contract is as follows:

"Payments to contractors.—(a) Unless otherwise provided in the specifications, partial payments will be made as the work progresses at the end of each calendar month, or as soon thereafter as practicable, on estimates made and approved by the contracting officer. * * *

"(b) In making such partial payments there shall be retained 10 percent on the estimated amount until final completion and acceptance of all work covered by the contract; * * * That on completion and acceptance of each separate building, vessel, public work, or other division of the contract, on which the price is stated separately in the contract, payment may be made in full, including retained percentages thereon, less authorized deductions.

"(c) All material and work covered by partial payments made shall thereupon become the sole property of the Government * * *."

After the buildings were completed and accepted, this action was commenced against appellant and its surety by appellees —as plaintiff and interveners—claiming they had supplied labor and materials which entered into the construction of the buildings and for which they had not been fully paid.

The action was brought under the Heard Act (40 USCA § 270). Appellant put in issue the allegation that the contracts were contracts for public buildings or public works within the meaning of that act, and by stipulation that issue was submitted to the lower court, which found that the contracts and the work were contracts for public works and that the surety was liable under the bonds executed in accordance with the act.

We granted a special appeal, and the single question for decision is whether an action in the name of the United States can be brought on the bonds given to the United States to secure the performance of contracts for the construction of dormitories on land owned by Howard University. And this involves, in the view we take of the case, the question: Were the contracts, contracts for public buildings and public works within the meaning and contemplation of the Heard Act.

The statute (Act of August 15, 1894, as amended by Act of February 24, 1905, 40 USCA § 270) requires any person entering

George P. Lemm and Harold Brody, both of Washington, D. C., for appellant.

Bates Warren, Charles W. Clagett, William C. Sullivan, Fred J. Rice, Foster Wood, Vivian O. Hill, and Paul Sleman, all of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

In November, 1930, appellant entered into contracts with the United States for the erection of three dormitory buildings at Howard University. Consolidated Indemnity & Insurance Company executed the usual statutory bonds. The contracts were signed on behalf of the United States by the Assistant Secretary of Interior, and were on the government standard contract forms and obligated the contractor to furnish all labor and materials and perform all work required in the construction of

into a contract with the United States for the construction of any public building or the prosecution and completion of any public work to execute a bond conditioned that the contractor shall promptly make payment to all persons supplying him with labor and materials in the prosecution of the work. It gives to all such persons the right of intervention in a suit upon the bond. In short, besides securing the United States, the act as the title declares, is intended to protect persons furnishing materials or labor for the construction of "public buildings or works."

The statute was passed in recognition of the inability of contractors on public works of the United States to take liens upon the property, and the Supreme Court has held that the statute should be liberally construed. Hundreds of cases interpreting one or another of its provisions may be found in the reports. A large number of these deal with the question: What are labor and materials within the statute? Others with questions affecting the final settlement of the liability of the surety, the rights of subcontractors and persons furnishing them labor and materials, priorities between claimants, the surety's rights of subrogation, jurisdiction and the nature of proceedings to recover on the bond. But there is a singular lack of authority defining the phrase "public works." Attorney General Griggs in the early stages of the law, was of opinion that the act had no relation to contracts for the construction of movable articles and was confined to permanent structures like buildings upon land to which the United States had acquired complete title, etc. (23 Op. Attys. Gen. 174), but in Title Guaranty & Trust Co. v. Crane Co., 219 U. S. 24, 31 S. Ct. 140, 142, 55 L. Ed. 72, it was held that a *vessel* being built for the United States, the title to which by the contract passed to the government as fast as paid for, was a public work within the provisions of the act. On the other hand, that without such contract provision, the vessel while in the course of construction was not a public work of the United States and was subject to the lien given by the state law to creditors furnishing labor and materials in the construction; the point of difference obviously centering on the question of title.

But none of the questions decided by the Supreme Court in the Crane Case are particularly helpful in this, except that Mr. Justice Holmes, who wrote the opinion, defines "public works," as used in the Heard Act, in these words: "If it [the work] belongs to the representative of the public, it *is public.*"

Read literally, this definition would confine the provisions of the act to those contracts involving public works of which the ownership is in the federal government, and this, we think, is the true test. In the title and in the body of the act the words used limit its provisions to contracts for the construction of public buildings or the prosecution and completion of public works, and these terms, we think, mean buildings or works of the United States.

Howard University is a private corporation. It was incorporated under an act passed March 2, 1867 (14 Stat. 438), and its charter gives it all the rights and powers usually vested in private corporations, including the right to purchase and sell real estate, and the right to contract and to sue and to be sued. The university has an attendance of about two thousand students who pay tuition and certain fixed charges for living expenses. Its buildings are erected on land of which the title is in Howard University. The first federal appropriation for its aid was March 3, 1879—some twelve years after its organization. Thereafter the United States have annually contributed to the construction, maintenance, and development of the institution. The amount of the appropriations has increased from $10,000 in 1882 to $675,000 in 1932. By Act of March 3, 1891 (26 Stat. 973), the officers of the university were required to report to the Secretary of the Interior how the appropriation for salaries was expended; and so also by Act of August 5, 1892 (27 Stat. 372). By Act of June 11, 1896 (29 Stat. 437), the Secretary of the Interior was given authority to supervise the expenditure of money under the appropriation for that year, and the right of the Secretary to visit and inspect the university was provided. The appropriation for salaries represented only a part of the total of the salaries paid, the balance being provided by donations and from other sources. In a report of the House Committee on Education filed February 8, 1928, to accompany H. R. 279, it is stated that: "Since the establishment of the Budget system, however, and the consolidation of all jurisdiction over appropriations in one committee of the House, items recommended by the Budget and approved by the Committee on Appropriations have frequently been stricken out in the House on the point

of order that such appropriations are not authorized by existing law." To avoid this, the bill proposed to amend the charter of the university to make it permissible for Congress each year "without the upsets of points of order" to make such appropriations as Congress might desire. The act was approved December 13, 1928 (45 Stat. 1021), having been previously authorized and approved by the authorities of the university. It amended section 8 of the act of incorporation as follows: "Annual appropriations are hereby authorized to aid in the construction, development, improvement, and maintenance of the university, no part of which shall be used for religious instruction. The university shall at all times be open to inspection by the Bureau of Education and shall be inspected by the said bureau at least once each year. An annual report making a full exhibit of the affairs of the university shall be presented to Congress each year in the report of the Bureau of Education."

This amendment of the charter of the university goes no farther than its terms. If it successfully legalizes the appropriation out of the Treasury of money of the government in aid of a private institution, it does not, nor does it purport to, change the fundamental character of the institution or make it any the less private; for Congress has passed no law giving the Secretary of the Interior or any other officer of the government control of the university, and we think it is obvious it could not do so without the consent and approval of the corporate authorities of that institution. Hence, in the view we take, the generosity of the government is not enough in itself to change a private into a public institution. This thought is admirably expressed by Justice Story in Allen v. McKean, Fed. Cas. No. 229, 1 Sumn. 276. The case involved the charter of Bowdoin College and was a suit by its treasurer for the recovery of salary. The college was established by an act of the Legislature (Massachusetts), and was declared to be a body corporate and to have the usual powers of corporations. It was the recipient of the bounty of the Legislature, and one of the questions in the case was whether in these circumstances it was a private corporation or a public corporation controllable by the legislature. Answering this query, Justice Story said:

"That a college established for the promotion of education, and for instruction in virtue and piety, and in the liberal arts and sciences, is in some sense a public institution or corporation, cannot well be denied; for it is for the benefit of the public at large, or at least for all persons, who are suitable objects of the bounty; and this is the popular sense, in which the language is commonly used. And in this sense an institution founded exclusively by private donors for purposes of general charity, such as a hospital for the poor, the sick, the disabled, or the insane, may well be called a public institution. But in the sense of the law a far more limited, as well as more exact, meaning is intended by a public institution or corporation. Upon this subject, however, I may well spare myself from any elaborate exposition, since it was fully considered in the great case of Dartmouth College v. Woodward, 4 Wheat. (17 U. S.) 518 [4 L. Ed. 629], from which I will make a quotation, contained in the opinion of one of the judges, which it is well known had the approbation of the court: 'Public corporations,' says the opinion, 'are generally esteemed such as exist for public political purposes only, such as towns, cities, parishes, and counties; and in many respects they are so, although they involve some private interests. But, strictly speaking, public corporations are such only, as are founded by the government for public purposes, where the whole interests belong also to the government. If, therefore, the foundation be private, though under a charter of the government, the corporation is private, however extensive the uses may be, to which it is devoted, either by the bounty of the founder, or the nature and objects of the institution. For instance, a bank created by the government for its own use, whose stock is exclusively owned by the government, is, in the strictest sense, a public corporation. So is a hospital created and endowed by the government for general charity,' (meaning as is obvious from the context, a hospital like the Navy Hospital, or the General Marine Hospital, established and supported by the United States out of its own funds, and over which it retains the entire government). 'But a bank, whose stock is owned by private persons,' (and it might have been added partly by private persons and partly by the government,) 'is a private corporation, although it is erected by the government, and its objects and operations partake of a public nature. The same doctrine may be affirmed of insurance, canal, bridge, and turnpike companies. In all these cases

the uses may, in a certain sense be called public; but the corporations are private; as much so, indeed, as if the franchise were vested in a single person.' 'This reasoning applies in its full force to eleemosynary corporations. A hospital, founded by a private benefactor, is in point of law a private corporation, although dedicated by its charter to general charity. So is a college, founded and endowed in the same manner, although being for the promotion of learning and piety, it may extend its charity to scholars from every class of the community, and thus acquire the character of a public institution. This is the unequivocal doctrine of the authorities; and cannot be shaken, but by undermining the most solid foundations of the common law.' It is afterward added: 'The fact, then, that the charity is public, affords no proof, that the corporation is also public; and consequently the argument, so far as it is built upon this foundation, falls to the ground. If, indeed, the argument were correct, it would follow, that almost every hospital and college would be a public corporation, a doctrine irreconcilable with the whole current of decisions since the time of Lord Coke.' ·And it is further stated, that no authority exists in the government to regulate, control, or direct a corporation, or its funds, 'except where the corporation is in the strictest sense public; that is, where its whole interests and franchises are the exclusive property and domain of the government itself.' See (Dartmouth College v. Woodward) 4 Wheat (17 U. S.) [518], 668–672 [4 L. Ed. 629].

"That a college, merely because it receives a charter from the government, though founded by private benefactors, is not thereby constituted a public corporation, controllable by the government, is clear beyond any reasonable doubt. So the law was understood by Lord Holt, in his celebrated judgments in Philips' v. Bury, 1 Ld. Raym. 8, 2 Term. R. 346. Lord Hardwicke, in Attorney General v. Pearce, 2 Atk. 87, said: 'The charter of the crown cannot make a charity more or less public, but only more permanent than it would otherwise be.' And the decision of the supreme court, in the case of Dartmouth College v. Woodward, is direct to the same purpose.

"Nor does it make any difference, that the funds have been generally derived from the bounty of the government itself. The government may as well bestow its bounty upon a private corporation for charity, as upon a public corporation; and its funds once bestowed upon the former become irrevocable, precisely in the same manner, and to the same extent, as if they had been bestowed upon an individual."

And, in passing, it may be suggested in connection with the quoted words above that if Howard University were dissolved by corporate authority or otherwise, it is quite clear the United States would have no claim or title of any nature to any of its assets; and it is equally true, of course, that they have no claim or title of any nature while the university exists and functions.

The conclusion reached by Justice Story is followed in decisions in various state court cases. Thus, in Inhabitants of Orono v. Sigma A. E. Society, 105 Me. 214, 74 A. 19, it was held that the University of Maine, which was chartered as a private institution, though it was in receipt of annual appropriations from the state, was not a public educational institution, but a legal entity wholly separate and apart from the state; and it was further held that gifts, however large, could not change the character or legal status of the institution.

In State v. Neff, 52 Ohio St. 375, 40 N. E. 720, 28 L. R. A. 409, which was a case in which the Legislature of Ohio undertook to transfer the property of the Cincinnati Lancaster Seminary, an incorporated institution for the instruction of youth, to a new corporation known as the President, Trustees, and Faculty of the Cincinnati College, it was held that this could not be done, because the property of such an institution is private property and the corporation itself a private corporation. Citing Dartmouth College v. Woodward, 4 Wheat. 518, 4 L. Ed. 629; Vincennes University v. Indiana, 14 How. 268, 269, 14 L. Ed. 416; Inhabitants of Yarmouth v. Inhabitants, etc., 34 Me. 411, 56 Am. Dec. 666; and a number of other cases.

In Georgia, in the case of Medical College v. Rushing, 1 Ga. App. 468, 57 S. E. 1083, it was held that the Medical College of Georgia, which received appropriations from the state and which had been designated by law as a branch of the University of Georgia, was a private and not a public corporation and was liable for the torts of its agents.

In Maryland, in Clark v. Maryland Institute, 87 Md. 643, 41 A. 126, the question was the right of Negro children to attend an institute incorporated for the

promotion of the mechanic arts. There the institute had been originally incorporated as a private corporation. Subsequently its charter was renewed under an act of the Legislature granting it an annual appropriation. It was held that this did not change the nature of the corporation or make it an instrument of the government for the administration of public duties. See, also, Cleaveland v. Stewart, 3 Ga. 283.

In Illinois, in Board v. Bakewell, 122 Ill. 339, 10 N. E. 378, the institution was a normal university. The board of trustees in their reports to the Legislature repeatedly represented themselves as a public corporation and obtained appropriations from the state, but it was held that these conditions did not operate to change the character of the corporation from private to public. See, also, Regents of University of Maryland v. Williams, 9 Gill & J. (Md.) 365, 397, 31 Am. Dec. 72.

Numerous other cases to the same effect can be cited and, so far as our examination has gone, there are none to the contrary; and so we reach the conclusion that Howard University is a private institution;

That its right and title to its buildings is not affected by the fact that many of them may be the result of the generosity of the national government;

That its rights and powers and liabilities are fixed by its charter and the laws in relation to private corporations;

That the buildings involved in this controversy are neither public buildings nor public works, and that the bonds sued on were—in view of these several conclusions —not within the provisions or contemplation of the Heard Act.

■ This leaves only for consideration the single question whether a provision in the contract, as follows: "(c) All material and work covered by partial payments made shall thereupon become the sole property of the Government"—necessitates a different conclusion.

As we have already had occasion to remark, the construction contracts were on the government standard forms of building contracts applicable alike to permanent buildings and to ships. The provision quoted above is a part of such standard forms, and was held in United States v. Ansonia Brass & Copper Co., 218 U. S. 452, 31 S. Ct. 49, 54, 54 L. Ed. 1107, to pass title to the United States in a vessel in process of construction for the United States. In that case, in rejecting the right of those furnishing labor or materials in the construction of the vessel to a lien under the state law, the Supreme Court said: "We are not now dealing with the right of a state to provide for such liens while property to the chattel in process of construction remains in the builder, who may be constructing the same with a view to transferring title therein to the United States upon its acceptance under a contract with the government. *We are now treating of property which the United States owns.* [Italics supplied.] Such property, for the most obvious reasons of public policy, cannot be seized by authority of another sovereignty, against the consent of the government. The Benyuard, as fast as constructed, became one of the instrumentalities of the government, intended for public use, and could not be seized under state laws to answer the claim of a private person, however meritorious."

But the facts are wholly different here. The acts of Congress appropriating money for the building of the dormitories contained no other limitation in its use than that it should be expended under the direction of the Secretary of the Interior. It was the same sort of bounty or gratuity that Congress has extended time and again to the incorporated hospitals in Washington. It was a gift of money, and there were no strings tied to it, except that it should be used for a designated purpose. The language of the appropriation is: "Dormitory building: For the construction of an additional dormitory for young women at Howard University, for which an appropriation of $150,000 was made in the Interior Department Appropriation Act for the fiscal year 1928, the Secretary of the Interior is authorized to enter into a contract or contracts which, including equipment for such dormitory, shall not exceed $190,000." 45 Stat. p. 904. See, also 44 Stat. p. 971, and 46 Stat. p. 324.

We think it may not be logically or reasonably argued that the appropriation by the government of this money created, or was intended to create, any title in the United States in the buildings either in process of erection or when erected on the land of Howard University. The language of the acts is inconsistent with such an idea. But even if the government had expressly conditioned the gift upon the passing of title to itself temporarily, that result would

not follow without appropriate corporate action by the university assenting thereto; and no one contends that anything of that nature has ever happened. The appropriation made, and the work begun, the buildings as they progressed became the property of Howard University, anything in the contracts between the Secretary and the contractor to the contrary; and so, in the view we take, the provision of the contracts that title should vest in the United States as the payments were severally made is wholly ineffective to accomplish that result. The buildings when begun, and when completed belonged to Howard University to the same extent and by the same title as every other building on its campus. To hold otherwise would, as we think, be to establish "a doctrine irreconcilable with the whole current of decisions since the time of Lord Coke."

In this view, the provision in the contracts to which we have referred did not change the character of the work or bring the contracts themselves within the provisions of the act.

As was said by the Supreme Court of New York in passing on the rights of materialmen in a suit on a bond executed under the Heard Act: "The object of the act is fully subserved by construing it to relate to the construction of public buildings and the prosecution and completion of public works in the sense that they belong to and are the property of the public * * *." United States v. Empire State Surety Co., 114 App. Div. 755, 100 N. Y. S. 247, 248.

This we also decided in United States v. Faircloth, 49 App. D. C. 323, 265 F. 963. The local statute involved there was substantially like the Heard Act. We held that the act, which required persons contracting with the District of Columbia for the construction of a public building or the prosecution of a public work to give a bond to secure payment for labor and materials, etc., had no force or effect in a case in which the District did not own the building or the property on which it was erected.

Holding, as we do, these views, we are obliged to hold that plaintiffs had no case on the bond taken by the Secretary of the Interior. That official might have taken another and different bond under which appellees could have claimed protection, or he might have taken no bond at all, or appellees might have taken means to protect themselves; but in the circumstances we have detailed there was no authority in the Secretary to take a bond under the provisions of the Heard Act. And the fact that he did will not of itself entitle appellees to sue upon it. If the bond was not one of the nature contemplated by the statute, no rights accrued to appellees for the reason that in such case the act would not authorize its execution. The same result follows if it be considered a common-law bond, for at common law an obligation to which one is neither party nor privy furnishes no protection to such a one. In order to maintain this action, plaintiffs must have been engaged in work within the provisions of the act; that is to say, they must have been furnishing labor and materials in the construction of a public building or public work belonging to the United States or a public work in which the United States are exercising a constitutional paramount power—as in the improvement of the navigable waterways of the country.

The judgment below is reversed, and the case remanded for further proceedings in accordance with this opinion.

This opinion was prepared after the death of Associate Justice HITZ.